904 A.2d 825 (2006)
387 N.J. Super. 551
Robert A. PLEMMONS, Plaintiff-Appellant/Cross-Respondent,
v.
BLUE CHIP INSURANCE SERVICES, INC. a/k/a Blue Chip Insurance, and Nelson Pullaro, Defendants-Respondents/Cross-Appellants, and
Borough of Audubon, Shirley Himmelman and Claire Remenicky, Defendants-Respondents, and
Preserver Insurance Company, Nico Electric, Marshall Williams, Bell Supply Company, Biggs Quality Painting, Timothy M. Biggs, and Robert Scouler, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 14, 2006.
Decided August 21, 2006.
*828 F. Michael Daily, Jr. argued the cause for appellant/cross-respondent.
Nancy L. Siegel, Cherry Hill, argued the cause for respondents/cross-appellants (White and Williams, attorneys; Ms. Siegel, of counsel and on the brief, Robert E. Campbell, on the brief).
William J. Martin, Westmont, argued the cause for respondent Borough of Audubon (Martin, Gunn & Martin, attorneys; Burchard S. Martin, of counsel and on the brief, William J. Martin, on the brief).
Timothy J. Galanaugh, Philadelphia, PA, argued the cause for respondents Shirley Himmelman and Claire Remenicky (Murphy & O'Connor, attorneys; Mr. Galanaugh, on the brief).
Before Judges SKILLMAN, AXELRAD and SABATINO.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
The primary issue presented by this appeal is whether an insurance broker may be subject to liability under the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20. We conclude that an insurance broker is a semi-professional, who is subject to testing, licensing and regulation under other statutory provisions, and therefore is excluded from liability under the CFA for the performance of brokerage services.
In the fall of 1999, plaintiff entered into a contract to purchase a residential property in Audubon, New Jersey. Plaintiff planned to convert the property from residential to commercial uses.
Before the initial closing date, plaintiff's representative contacted defendant Nelson Pullaro, an insurance broker employed by defendant Blue Chip Insurance Services, also an insurance broker, to obtain insurance coverage for the property. *829 Plaintiff paid a $361 premium, and Blue Chip issued a declaration sheet for a homeowner's policy. However, this policy was voided due to a delay in the closing date.
Before the new closing date, Pullaro found out that plaintiff was acquiring the property for commercial uses and allegedly advised plaintiff's representative that plaintiff would need to obtain a business operations policy (BOP) rather than a homeowner's policy. Plaintiff never paid the premium for a BOP, and neither a BOP nor a homeowner's policy was issued. As a result, the property was uninsured when it was damaged by a storm and by the alleged negligence of contractors performing work required to convert it from residential to commercial uses. Blue Chip never returned the $361 premium plaintiff paid for a homeowner's policy, and it allegedly failed to inform plaintiff that he did not have the coverage such a policy would have provided.
Although the commercial uses plaintiff planned to conduct on the property were permitted uses, plaintiff was required to apply to the planning and zoning board (Board)[1] for site plan approval due to the proposed change in use. Before applying for this approval, plaintiff contracted with defendant Nico Electric to do electrical work. Defendant Robert Scouler, the Audubon construction official, issued a permit authorizing this work.
On February 2, 2000, Scouler issued a stop work order on the grounds that the electrical work being performed by Nico exceeded the scope of the construction permit and that plaintiff was required to obtain the Board's approval before converting the property from residential to commercial uses. Scouler issued this order after visiting the property and observing a Nico electrician installing the emergency and exit lights required for the proposed commercial uses. Scouler apparently had not been aware before issuing the construction permit that plaintiff planned to convert the property to commercial uses and had to obtain site plan approval for this purpose.
On March 16, 2000, plaintiff filed an application for site plan approval. At a March 27, 2000 workshop meeting, the Board notified plaintiff that his site plan was inadequate. Plaintiff subsequently notified the Board that he had retained an engineering firm to prepare a complete site plan.
Around this time, a tree fell on plaintiff's property, damaging the roof and rear porch of the house. Plaintiff contracted with a roofer to repair the damage, and on May 12, 2000, Scouler issued a construction permit authorizing emergency repairs to the roof. However, Scouler visited the premises several times during the next few weeks and did not observe any repair work being done on the roof. Based on these observations, Scouler concluded that there was no need for emergency roof repairs and that plaintiff's application for a construction permit contained "false and misleading information as to the state of emergency." Accordingly, on May 31, 2000, Scouler issued a stop work order for the planned roof repairs.
Shortly thereafter, plaintiff filed an appeal to the Camden County Construction Board of Appeals. This appeal was resolved by a settlement, memorialized by a letter dated August 7, 2000, under which plaintiff was allowed to complete the repairs to the roof, demolish and remove the damaged rear porch, and complete the electrical work on the house with the exception *830 of the work needed for the proposed emergency and exit lights.
On September 25, 2000, plaintiff submitted a site plan prepared by an engineering firm, and on November 13, 2000, the Board approved plaintiff's application for site plan approval. However, because plaintiff did not pay the $1575 in escrow fees required to undertake the project until May 2001, a resolution memorializing this approval was not issued until August 2001. During the intervening period, no construction permits were issued.
On November 22, 2002, plaintiff sold the property without completing the construction work required to convert it from residential to commercial uses.
Plaintiff brought this action against Blue Chip, Pullaro and Preserver Insurance Company, a liability and property insurer with which the Blue Chip and Pullaro placed coverage for customers. Plaintiff asserted claims for breach of contract, negligence, and violations of the CFA against these defendants. By an amended complaint, plaintiff added the Borough of Audubon and Scouler as defendants, asserting claims under the Federal Civil Rights Act of 1871 (42 U.S.C.A. § 1983). By a second amended complaint, plaintiff named as additional defendants Shirley Himmelman, the chairperson of the combined planning and zoning board, and Claire Remenicky, Scouler's secretary, as well as various contractors who performed work on plaintiff's property.
During the pendency of the action, Scouler filed a bankruptcy petition, which resulted in a stay of trial proceedings. Plaintiff's claim against Scouler was resolved in the bankruptcy proceedings and Scouler was dismissed from this action.
After the completion of discovery, the trial court granted motions by Audubon, Himmelman and Remenicky for summary judgment, dismissing plaintiff's claims under section 1983. The court also granted Blue Chip, Pullaro and Preserver partial summary judgment, dismissing plaintiff's breach of contract claims. Plaintiff subsequently either dismissed or abandoned his claims against the contractor defendants.
As a result, the case went to trial solely against Blue Chip, Pullaro and Preserver. At the close of plaintiff's case, the trial court dismissed his claims against Preserver.
The jury subsequently returned a verdict in plaintiff's favor on his negligence and CFA claims against Blue Chip and Pullaro. On the negligence claim, the jury found that plaintiff also had been negligent in failing to obtain insurance coverage, and it attributed 30% responsibility for the lack of coverage to him. It awarded plaintiff $25,000 in damages for the decrease in property value, and $10,000 in damages for repair costs. On the CFA claim, the jury awarded plaintiff these same damages as well as $441 for the insurance premiums plaintiff had paid to Blue Chip.
Blue Chip and Pullaro moved for a new trial or, in the alternative, judgment notwithstanding the verdict. The trial court concluded, based on Macedo v. Dello Russo, 178 N.J. 340, 840 A.2d 238 (2004), which was decided a few weeks before the beginning of trial, that insurance brokers are not subject to the CFA. Therefore, the court granted Blue Chip and Pullaro's motion for judgment notwithstanding the verdict on plaintiff's CFA claims. The court denied these defendants' motion for a new trial and entered a molded judgment in plaintiff's favor on the negligence claim for $24,500 plus prejudgment interest.
Plaintiff filed a notice of appeal from dismissal of his CFA claim against Blue Chip and Pullaro and the summary judgment dismissing his section 1983 claims against Audubon, Himmelman and Remenicky. *831 Blue Chip and Pullaro filed a conditional cross-appeal from the trial court's tentative rulings regarding the amount of damages that would be recoverable for plaintiff's CFA claims. They have not appealed from the judgment memorializing the jury verdict in plaintiff's favor on his negligence claim, and plaintiff has not appealed from the dismissal of his claim against Preserver.
We affirm both the dismissal of plaintiff's claim under the CFA and the summary judgment in favor of Audubon, Himmelman and Remenicky. Our affirmance of the dismissal of plaintiff's CFA claim makes it unnecessary to address the arguments presented in the conditional cross-appeal.

I
We first consider whether an insurance broker may be subjected to liability under the CFA for the performance of brokerage services.
The CFA is intended to protect consumers "by eliminating sharp practices and dealings in the marketing of merchandise and real estate." Channel Cos. v. Britton, 167 N.J.Super. 417, 418, 400 A.2d 1221 (App.Div.1979). The Act prohibits
[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby[.]
[N.J.S.A. 56:8-2.]
The Act defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).
In Neveroski v. Blair, 141 N.J.Super. 365, 377-80, 358 A.2d 473 (App.Div.1976), we held that real estate brokers are not subject to the CFA. In reaching this conclusion, we stated:
[T]he entire thrust of the Consumer Fraud Act is pointed to products and services sold to consumers in the popular sense. Such consumers purchase products from retail sellers of merchandise consisting of personal property of all kinds or contract for services of various types brought to their attention by advertising or other sales techniques. The legislative language throughout the statute and the evils sought to be eliminated point to an intent to protect the consumer in the context of the ordinary meaning of that term in the market place.
. . . .
A real estate broker is in a far different category from the purveyors of products or services or other activities. He is in a semi-professional status subject to testing, licensing, regulations and penalties through other legislative provisions. See N.J.S.A. 45:15-1 et seq. Although not on the same plane as other professionals such as lawyers, physicians, dentists, accountants or engineers, the nature of his activity is recognized as something beyond the ordinary commercial seller of goods or services  an activity beyond the pale of the act under consideration.
Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the Consumer Fraud Act despite the fact that he renders "services" to the public. *832 And although the literal language may be construed to include professional services, it would be ludicrous to construe the legislation with that broad a sweep in view of the fact that the nature of the services does not fall into the category of consumerism.
Similarly, in the absence of clear and explicit language in the statute, a broker who negotiates the sale of real estate and thereby renders "services" is nevertheless outside the scope of persons sought to be covered by the Act.
[Id. at 378-80, 358 A.2d 473 (footnote omitted).]
In Macedo v. Dello Russo, 359 N.J.Super. 78, 84, 819 A.2d 5 (App.Div.2003), a panel of this court stated that to the extent "the limiting dictum in Neveroski" had "ever had a basis in apparent legislative design, subsequent statutory and decisional developments have negated it as a categorical exception to application of the Act." The panel pointed to Lemelledo v. Beneficial Mgmt. Corp., 150 N.J. 255, 270, 696 A.2d 546 (1997), which held that the CFA applied to an insurance sales scheme conducted by a commercial lender, as one of the primary "decisional developments" since Neveroski. Based on this view of the governing law, the panel concluded that a claim could be pursued under the CFA for alleged deceptive advertising by a physician.
However, the Supreme Court reversed the panel's decision, relying primarily upon Neveroski. Macedo, supra, 178 N.J. 340, 840 A.2d 238. The Court stated that it "disagree[d] with [the panel's] analysis [of Neveroski] as well as [the panel's] reliance on . . . Lemelledo," which the Court "view[ed] as unsupportive of [the panel's] conclusion." Id. at 343, 840 A.2d 238. The Court quoted Neveroski at length, including the part that describes a real estate broker as occupying "a semi-professional status subject to testing, licensing, regulations, and penalties through other legislative provisions[,]" whose professional activity, "[a]lthough not on the same plane as other professionals such as lawyers, physicians, dentists, accountants or engineers,. . . is recognized as something beyond the ordinary commercial seller of goods or services  an activity beyond the pale of [the CFA]." Id. at 344, 840 A.2d 238 (quoting Neveroski, supra, 141 N.J.Super. at 379, 358 A.2d 473). Based on this analysis, the Court concluded:
Thus, today, forty years after the CFA was enacted, our jurisprudence continues to identify learned professionals as beyond the reach of the Act so long as they are operating in their professional capacities. The Legislature is presumed to be aware of that judicial view.
. . . .
We therefore must assume that the Legislature approves of the consistent judicial interpretation of the CFA that has been extant for four decades. Under that interpretation, advertisements by learned professionals in respect of the rendering of professional services are insulated from the CFA but subject to comprehensive regulation by the relevant regulatory bodies and to any common-law remedies that otherwise may apply. We consider ourselves bound by that Legislative acquiescence. If we are incorrect in our assumption, we would expect the legislature to take action to amend the statute.
[Id. at 345-46, 358 A.2d 473.]
Plaintiff argues that this case is controlled by Lemelledo rather than Neveroski and Macedo. However, Lemelledo did not involve a CFA claim against an insurance broker or other party who could be characterized as a "professional" or "semi-professional." Macedo, supra, 178 N.J. at *833 344, 840 A.2d 238. The defendant in Lemelledo was a commercial lender who engaged in a practice called "loan packing," under which the principal amount of a consumer loan is increased by the cost of "loan-related services, such as credit insurance that the borrower does not want." 150 N.J. at 259-60, 696 A.2d 546. In light of the CFA's broad definitions of "advertisement" and "merchandise," N.J.S.A. 56:8-1(a),(c), the Court concluded that the Act applies to the sale of both consumer credit and insurance, and consequently also to "the sale of insurance in conjunction with lending, that is, loan packing." Id. at 266, 696 A.2d 546.
The Court rejected the commercial lender's argument that the CFA should be interpreted to exclude the sale of credit insurance from liability under the CFA because this activity is regulated under various other statutes. See id. at 266-73, 696 A.2d 546. In rejecting this argument, the Court stated: "Absent a nearly irreconcilable conflict, to allow one remedial statute to preempt another or to co-opt a broad field of regulatory concern, simply because the two statutes regulate the same activity, would defeat the purposes giving rise to the need for regulation." Id. at 271, 696 A.2d 546. The Court concluded that the commercial lender had not established such an "irreconcilable conflict" between the CFA and other statutory provisions regulating the sale of consumer credit and insurance. See id. at 271-74, 696 A.2d 546. Therefore, it is clear under Lemelledo that financial institutions and insurance companies that sell insurance policies "as goods and services that are marketed to consumers" are subject to the CFA. Id. at 265, 696 A.2d 546; see also Laufer v. U.S. Life Ins. Co. in N.Y., 385 N.J.Super. 172, 896 A.2d 1101 (App.Div. 2006); Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J.Super. 31, 752 A.2d 807 (App. Div.2000).
However, Lemelledo did not address the legislative intent this court recognized in Neveroski and the Supreme Court later reaffirmed in Macedo to exclude licensed professionals from the provisions of the CFA. If there were any doubt that Lemelledo had no effect upon this long-standing exclusion, it would be dispelled by the Court's discussion of Lemelledo in Macedo:
Nothing in Lemelledo suggests a contrary conclusion. There, in addressing loan-packing, we held that the mere existence of an alternative regulatory scheme by the Department of Banking and Insurance, did not automatically eliminate the applicability of the CFA. Instead, we held that a direct conflict between the schemes would be required in order to conclude that the Legislature did not intend the CFA to apply. Lemelledo would be dispositive here if the issue presented was whether the separate regulatory scheme governing physicians preempts the application of the CFA. It is entirely irrelevant to the threshold question of whether the CFA applies to learned professionals in the first instance.

[178 N.J. at 345, 840 A.2d 238 (emphasis added).]
Therefore, regardless of whether there is an irreconcilable conflict between the CFA and the statutory provisions under which professionals are regulated, members of "learned professions," including those who occupy a "semi-professional status," engage in "an activity beyond the pale of the [CFA]." Id. at 344, 840 A.2d 238 (quoting Neveroski, supra, 141 N.J.Super. at 379, 358 A.2d 473).
Furthermore, we are satisfied that insurance brokers are "semi-professional[s]" who are excluded from liability under the CFA for the services they render *834 within the scope of their professional licenses. Under the Insurance Producer Licensing Act, N.J.S.A. 17:22A-26 to -48, a person "shall not sell, solicit or negotiate insurance in this State unless the person is licensed for that line of authority," N.J.S.A. 17:22A-29. A person obtains a license to "sell, solicit or negotiate insurance" by passing a written examination, N.J.S.A. 17:22A-31, and meeting the application requirements set forth in N.J.S.A. 17:22A-32. In addition, insurance brokers must comply with the Insurance Producer Standards of Conduct promulgated by the Department of Banking and Insurance. N.J.A.C. 11:17A-1.1 to 17D-2.8. These standards proscribe various "unfair trade practices," N.J.A.C. 11:17A-2.1 to -2.11, delineate an insurance producer's fiduciary duties to insureds, see N.J.A.C. 11:17A-4.1, -4.3, -4.5, -4.10, set forth requirements regarding commissions, N.J.A.C. 11:17B-2.1, fees, N.J.A.C. 11:17B-3.1 to -3.3, and management of funds, N.J.A.C. 11:17C-1.1 to -2.6, and provide penalties for violations, N.J.A.C. 11:17D-1.1 to -2.8. Therefore, insurance brokers are subject to testing, licensing and regulation comparable to real estate brokers, and thus are exempt from liability under the CFA for the reasons expressed by this court in Neveroski and reaffirmed by the Supreme Court in Macedo.

II
The Federal Civil Rights Act of 1871 (42 U.S.C.A. § 1983) creates a federal cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects. . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" Plaintiff claims that Himmelman and Remenicky, individually, and Audubon, as a municipal entity, violated his rights secured by the Equal Protection and Due Process Clauses of the Fourteenth Amendment. These claims are based on (1) Scouler's issuance of stop work orders for the electrical and roof repair work on the house; (2) Remenicky's alleged failure to give him applications for construction permits; and (3) the Board's delay in issuing a resolution memorializing its approval of plaintiff's application for site plan approval.

A
Plaintiff's claim that the defendants violated his rights under the Equal Protection Clause requires only limited discussion. R. 2:11-3(e)(1)(E). The threshold requirement for such a claim is a showing that the plaintiff "has been intentionally treated differently from others similarly situated[.]" Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060, 1063 (2000). Plaintiff did not present any evidence concerning defendants' treatment of other property owners. Since plaintiff failed to satisfy this threshold requirement of an equal protection claim, the trial court's summary dismissal of the claim was appropriate.

B
We next consider plaintiff's claim that defendants violated his rights under the Due Process Clause. This clause provides both "a guarantee of fair procedure," sometimes referred to as procedural due process, and "a substantive component that bars certain arbitrary, wrongful government actions[,]" sometimes referred to as substantive due process. Zinermon v. Burch, 494 U.S. 113, 126, 110 S.Ct. 975, 983, 108 L.Ed.2d 100, 113-14 (1990). Plaintiff has asserted both types of due process claims. We consider his procedural *835 due process claims in this subsection and his substantive due process claims in the next subsection.
To establish a violation of procedural due process, a plaintiff must show that the defendant deprived him of a protected property interest and that the local and state procedures for challenging the deprivation were inadequate. DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell, 53 F.3d 592, 597 (3d Cir.), cert. denied, 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995). A state provides constitutionally adequate procedural due process when it provides "reasonable remedies to rectify a legal error by a local administrative body." Ibid. To assert a claim for a deprivation of property without procedural due process, "the claimant must either avail himself of the remedies provided by state law or prove that the available remedies are inadequate." Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 643, 119 S.Ct. 2199, 2208, 144 L.Ed.2d 575, 590 (1999) (quoting Hudson v. Palmer, 468 U.S. 517, 539, 104 S.Ct. 3194, 3207, 82 L.Ed.2d 393, 411 (1984) (O'Connor, J., concurring)). Consequently, "[a] state cannot be held to have violated due process requirements when it has made procedural protections available and the plaintiff has simply refused to avail himself of them." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir.2000) (quoting Dusanek v. Hannon, 677 F.2d 538, 543 (7th Cir.), cert. denied, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982)).
We are satisfied that the governing New Jersey statutes provide administrative and judicial remedies for the alleged arbitrary actions of Audubon's officials relating to plaintiff's efforts to convert his property from residential to commercial uses that satisfy due process requirements.
The Uniform Construction Code Act, N.J.S.A. 52:27D-119 to -141, provides a right of appeal to a construction board of appeals from a construction official's "refus[al] to grant an application or refus[al] to act upon an application for a construction permit." N.J.S.A. 52:27D-127(b). The board of appeals is required to "hear the appeal, render a decision thereon and file its decision with a statement of reasons therefore with the enforcing agency from which the appeal has been taken not later than 10 business days following the submission of the appeal[.]" Ibid. In accordance with these provisions, plaintiff could have appealed the stop work orders issued by Scouler, and Remenicky's alleged refusals, acting at Scouler's direction, to process applications for construction permits, to the Camden County Construction Board of Appeals. In fact, plaintiff did eventually file such an appeal, which resulted in a settlement agreement that allowed him to proceed with the roof work and part of the electrical work on the house. If plaintiff had availed himself of this administrative remedy sooner, he undoubtedly could have prevented or at least reduced the damages that he claims were caused by Scouler's and Remenicky's arbitrary actions.
The Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, provides that a municipal land use agency shall adopt a memorializing resolution "not later than 45 days after the date of the meeting at which the municipal agency voted to grant or deny approval." N.J.S.A. 40:55D-10(g)(2). The MLUL also provides that
[i]f the municipal agency fails to adopt. . . a memorializing resolution [within this time], any interested party may apply to the Superior Court in a summary manner for an order compelling the municipal agency to reduce its findings and conclusions to writing within a stated time, and the cost of the application, *836 including attorney's fees, shall be assessed against the municipality.
[Ibid.]
The agency is required to mail a copy of the resolution to the applicant within ten days of its adoption. N.J.S.A. 40:55D-10(h). Consequently, when the Board failed to provide plaintiff with a resolution memorializing its decision to grant his application for site plan approval within the time provided under the MLUL, he could have brought an action under N.J.S.A. 40:55D-10(g)(2) for relief. The availability of such relief provides a remedy satisfying due process requirements for a party who does not receive a resolution memorializing a land use agency's decision within the time provided by the MLUL.

C
We next consider plaintiffs' substantive due process claims against Himmelman and Remenicky. In County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043, 1057 (1998), the Court held that "only the most egregious official conduct can be said to be `arbitrary in the constitutional sense[.]'" (quoting Collins v. Harker Heights, 503 U.S. 115, 129, 112 S.Ct. 1061, 1071, 117 L.Ed.2d 261, 276 (1992)). The "level of. . . abuse of power" required to support a substantive due process claim will be found only if an official's action "shocks the conscience." Ibid.
The Courts of Appeals have routinely utilized the "shocks the conscience" test in reviewing claims that the actions of officials responsible for passing upon land use and other related applications were so egregiously arbitrary that they violated a property owner's substantive due process rights. See, e.g., United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 399-402 (3d Cir.2003); PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 31-32 (1st Cir.), cert. dismissed as improvidently granted, 503 U.S. 257, 112 S.Ct. 1151, 117 L.Ed.2d 400 (1992). Under this test, "rejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process." Id. at 31; see also Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45-46 (1st Cir.1992) (holding that due process claims may not ordinarily be used to involve federal courts in local planning disputes); Chesterfield Dev. Corp. v. City of Chesterfield, 963 F.2d 1102, 1104-05 (8th Cir.1992) (holding that municipality's alleged arbitrary enforcement of a zoning ordinance, even in bad faith, would be insufficient to establish a substantive due process violation).
None of defendants' alleged arbitrary actions could be found to constitute "egregious official conduct" that "shocks the conscience." Himmelman, who was chairperson of the combined planning and zoning board, simply notified Scouler that plaintiff appeared to be performing construction work to convert his property from residential to commercial uses even though he had failed to apply for the site plan approval required to undertake this work. Scouler then conducted his own inspection of plaintiff's property, which disclosed that plaintiff was installing emergency and exit lights that were part of his plans for conversion of the property to commercial uses. Based on these observations, Scouler issued a stop work order that prohibited plaintiff from continuing with the electrical work. Thus, Himmelman's only role in the issuance of the stop work order for the electrical work was furnishing Scouler with information that plaintiff was apparently engaged in unlawful construction work.
Plaintiff asserts that Himmelman "order[ed] or cause[d] permits issued to [plaintiff] to be revoked[.]" However, as *837 chairperson of the Board, Himmelman had no authority to revoke a construction permit or to order Scouler to revoke a construction permit. Furthermore, there is no factual foundation for plaintiff's assertion that Himmelman was responsible for the issuance of the stop work orders. Both Scouler and Himmelman testified that Himmelman's only role in the issuance of the stop work order for the electrical work was to furnish Scouler with information that led him to conduct his own inspection of the premises and that she played no role whatever in the issuance of the stop work order for the roofing work.
Although Himmelman, as chairperson of the Board, apparently was responsible for withholding issuance of the resolution memorializing the site plan approval, plaintiff failed to present any evidence that the Board's action departed from its general practice. In fact, Scouler gave uncontroverted testimony that it is the general practice not only in Audubon but also the other municipalities in which he serves as the construction official not to issue memorializing resolutions until the required escrow fees are paid. Furthermore, even if the Board had issued the memorializing resolution within the time provided by N.J.S.A. 40:55D-10(g)(2), it could have required plaintiff to pay the escrow fees as a condition of his right to proceed with the work, see N.J.S.A. 40:55D-53(a)(1), which would have had the same practical effect as withholding issuance of the resolution until the fees were paid. See William M. Cox, New Jersey Zoning & Land Use Administration, § 24-7 at 555 (2006). We also note the absence of any evidence that plaintiff demanded issuance of the memorializing resolution anytime after the Board's approval of the site plan in November 2000 or inquired as to the reason for the delay. Under these circumstances, there is no basis for concluding that any of Himmelman's actions constituted the kind of egregious official misconduct required to support finding a violation of substantive due process rights.
Remenicky was Scouler's secretary. Remenicky's deposition testimony makes it clear that her responsibilities were limited to the processing of the paperwork relating to applications for construction permits and that Scouler, as the construction official, made all the discretionary decisions regarding the issuance of permits and stop work orders. Plaintiff alleges that Remenicky refused to give him an application for another construction permit after the issuance of stop work orders for the electrical and roofing work. However, plaintiff failed to establish that she was doing anything other than following Scouler's orders. Such compliance by a secretary with her supervisor's directions cannot support a finding of the egregious misconduct required to impose liability under section 1983 for a violation of substantive due process, at least in the absence of any evidence that the secretary was aware the supervisor was pursuing some nefarious objective.

D
Finally, we consider plaintiffs' claims against the Borough of Audubon.
A municipality may not be held liable under section 1983 for a violation of constitutional rights by one of its employees based on the doctrine of respondeat superior. Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 636 (1978). There are only three circumstances in which a municipality may be held liable for an employee's violation of constitutional rights. First, a municipality may be liable if an employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government *838 entity. Jett v. Dallas Indep. School Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598, 627-28 (1989). Second, a municipality may be liable if the employee had final policy-making authority, rendering his or her behavior an act of official government policy. Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452, 464 (1986). And third, a municipality may be liable if an employee with final policy-making authority has ratified the unconstitutional actions of a subordinate. City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107, 120 (1988).
Plaintiff failed to establish that Audubon could be held liable for Scouler's alleged violations of plaintiff's constitutional rights under any of these three tests. While "final policymaking authority" is generally a question of state law, the Court has indicated that "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." Ibid.
The State Uniform Construction Code Act was enacted to provide uniform construction standards and enforcement policies throughout the State. Bevacqua v. Renna, 213 N.J.Super. 554, 559, 517 A.2d 1215 (App.Div.1986). Pursuant thereto, a municipality may appoint licensed persons to the positions of construction official or subcode official, N.J.S.A. 52:27D-126, who "become responsible for administration and enforcement of the Uniform Construction Code," Bevacqua, supra, 213 N.J.Super. at 560, 517 A.2d 1215. A construction official serves as the chief administrator of the enforcing agency, establishes the day to day operating routines of the agency, and coordinates the activities of the subcode officials. N.J.A.C. 5:23-4.4(a)(1). The construction official's enforcing authority, e.g., to grant and deny permits and to issue stop work orders, is controlled by standards set forth in N.J.A.C. 5:23-2.1 to -2.39, which are formulated at the state level. Furthermore, a decision of a construction official is appealable to a construction board of appeals. N.J.S.A. 52:27D-126(a).
Thus, Scouler's performance of the responsibilities of construction official were tightly constrained by the provisions of the Uniform Construction Code and implementing regulations. Furthermore, any action taken by Scouler, including the issuance of a stop work order, was subject to review by the construction board of appeals. Therefore, Scouler did not have policy-making authority, and his decisions to issue stop work orders for the electrical and roofing work on plaintiff's property were not made pursuant to a formal government policy or a "standard operating procedure" long accepted within the government entity. Jett, supra, 491 U.S. at 737, 109 S.Ct. at 2724, 105 L.Ed.2d at 626. Instead, the issuance of those stop work orders were individualized decisions based on Scouler's understanding of plaintiff's construction plans and the requirements of the applicable administrative regulations.
Moreover, even if Audubon were subject to liability under section 1983 for Scouler's actions, none of Scouler's actions rose to the level of conscience-shocking misconduct required to support a finding of a violation of substantive due process. See Lewis, supra, 523 U.S. at 846, 118 S.Ct. at 1717, 140 L.Ed.2d at 1057. Plaintiff does not dispute that at least some of the electrical work that was being performed on his property when the stop work order was issued related to its conversion to commercial uses. Plaintiff also does not dispute that no repair work was done on the roof for several weeks, which *839 was the basis for Scouler's conclusion that there was no need for emergency repairs. Consequently, there was at least a semblance of a basis for Scouler's administrative decisions, which precludes a finding of a violation of substantive due process rights.
Affirmed.
NOTES
[1] Audubon had a combined planning board and zoning board of adjustment when plaintiff submitted his application. See N.J.S.A. 40:55D-25(c).