**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4093-23

JAMES G. LOWE, M.D.,

    Plaintiff-Appellant,

v.

BERNARD AUDET,
RICHARD LAVER, and
THE CREATIVE FINANCIAL
GROUP, LTD.,

    Defendants-Respondents.

_____

Argued February 4, 2025 – Decided June 24, 2025

Before Judges Gooden Brown and Vanek.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-0633-24.

Stephen J. DeFeo argued the cause for appellant (Brown & Connery, LLP, attorneys; Stephen J. DeFeo, Kathleen E. Dohn, and Taylor L. Johnson, on the briefs).

Jared K. Levy argued the cause for respondent Richard Laver (Wood, Smith, Henning & Berman, LLP, attorneys; Jared K. Levy, on the brief).

Barry R. Temkin argued the cause for respondents Bernard Audet and The Creative Financial Group, Ltd. (Mound Cotton Wollan & Greengrass LLP, attorneys; Katharine Anne Lechleitner, Barry R. Temkin, and Kate E. DiGeronimo, on the brief).

Robert H. Solomon argued the cause for amicus curiae New Jersey Association for Justice (Nagel Rice, LLP, attorneys; Bruce H. Nagel, on the brief).

PER CURIAM

By leave granted, plaintiff James G. Lowe, M.D., appeals from Law Division orders entered on July 19, 2024, granting motions to dismiss his claims under the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -210, against defendant insurance brokers Richard Laver and Bernard Audet and defendant The Creative Financial Group, Ltd. (CFG) (collectively defendants). We granted the New Jersey Association for Justice's (NJAJ) application to participate as amicus in support of plaintiff's position. Having considered the record and the governing principles, we affirm the dismissal of plaintiff's CFA claims.

2

I.

We glean these facts from plaintiff's complaint, accepting as true the facts alleged therein. Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 263 (1997). Through defendants, plaintiff, a neurosurgeon, procured four MetLife insurance policies: (1) an individual disability income (IDI) policy providing a $10,000 monthly benefit until age sixty-five, effective December 1, 2003; (2) another IDI policy providing a $10,000 monthly benefit until age sixty-seven, effective June 1, 2016; (3) a business overhead expense (BOE) policy with a $30,000 monthly benefit and a twenty-four-month maximum benefit period, effective February 17, 2009; and (4) another BOE policy with a $20,000 monthly benefit and a twelve-month maximum benefit period, also effective February 17, 2009.

The IDI policies covered plaintiff individually, while the BOE policies covered his surgical practice, Lowe Greenwood Zerbo Spinal Associates, P.A. (LGZ), of which he was a fifty-percent co-owner. Plaintiff alleged all four policies "contain[ed] a waiver of premiums benefit, which states 'we will waive any premium that becomes due while you remain disabled' and 'your policy and its benefits will continue as if the premium had been paid.'"[1]

---

[1] The insurance policies are not part of the record.

A-4093-23

In purchasing the policies, plaintiff alleged that he relied on his two-decades-long "special relationship" with defendants. Plaintiff's business relationship with CFG commenced in 2002. Audet and Laver, described as "a disability insurance expert," worked at CFG as insurance brokers, producers, and agents. Over the years, defendants marketed, sold, and procured insurance and financial products for plaintiff and his practice, including the four policies at issue in this case.

Specifically, plaintiff alleged that from 2003 to 2021, he met with Audet "at least [fifty-one] times" and provided him and Laver with "comprehensive information" regarding plaintiff's individual and business needs. In particular, plaintiff discussed his "need for insurance coverage" to cover "LGZ business expenses" and "to replace his income in the event he suffered a disability that prevented him from performing neurosurgery." In response, Audet represented that plaintiff would receive "maximum benefits for the maximum policy periods[] and premium payments would be waived" under the policies "regardless of any other factors." Plaintiff alleged that although Audet was aware of plaintiff's "medical-legal consulting business, which dated back to 2011," at "no time did Audet explain to [plaintiff] that MetLife would consider

4

income or expenses from any business interest unrelated to LGZ in reviewing a claim for benefits."

In addition, prior to procuring the IDI policies, Audet allegedly reviewed plaintiff's "existing disability policy, which was an 'own occupation' policy that provided coverage if [plaintiff] became injured and was unable to perform neurosurgery but would allow him to earn income in other vocations while still receiving disability benefits." After reviewing the policy, Audet advised plaintiff that the 2003 MetLife IDI policy "'compared favorably' to [plaintiff's] existing own occupation disability policy."

Plaintiff subsequently developed bilateral maculopathy, a progressive condition affecting the retina. As a result, plaintiff was unable to perform surgery and did not operate after September 14, 2021. He was also forced to "divest his ownership interests in and involvement with LGZ." On November 6, 2021, plaintiff had a teleconference with Laver. This was the "first time" he "dealt directly with Laver." During the conversation, Laver allegedly informed plaintiff that "Audet's statements about the coverage provided under the IDI [p]olicies were false," and that plaintiff "would probably only be covered under the residual disability benefit provision of the IDI [p]olicies."

A-4093-23

In December of 2021, plaintiff filed claims with MetLife under all four policies. MetLife denied the claims under the BOE policies and only paid partial benefits under the IDI policies, "claiming benefits are only payable . . . pursuant to the residual disability provision." Although "MetLife has acknowledged that [plaintiff] is permanently unable to perform neurosurgery," it claims plaintiff's "medical-legal consulting business prevents him from being considered totally disabled under the terms of the IDI . . . and BOE [p]olicies" because "its definition of [plaintiff's] 'regular occupation' includes revenues and expenses from his medical-legal consulting business."

Plaintiff alleged that "[t]he first time anyone raised [his] medical-legal consulting business . . . and related income or expenses as a potential bar to receiving maximum benefits" under the policies was during his conversation with Laver "after he suffered his disability and made claims for benefits from MetLife." Plaintiff continued to talk with Audet and Laver about "advocat[ing] on his behalf to support his claims for benefits." However, after MetLife denied his claims for "maximum benefits," Audet and Laver became "less responsive" and "ceased all communication by the summer of 2023."

On February 27, 2024, plaintiff filed a nine-count complaint seeking damages and asserting, among other things, that defendants committed fraud and

professional negligence, breached their fiduciary duties, and violated the CFA. Contemporaneously, pursuant to N.J.S.A. 2A:53A-27 and N.J.S.A. 2A:53A-26(o), plaintiff filed an affidavit of merit prepared by a licensed New Jersey insurance producer averring that based on his review of the complaint, defendants' conduct "deviated from the acceptable professional standards . . . of the insurance industry."

Defendants moved to dismiss certain counts in the complaint, including the CFA count (count seven), for failure to state a claim pursuant to Rule 4:6-2(e). Defendants argued that our decision in Plemmons v. Blue Chip Insurance Services, Inc., 387 N.J. Super. 551, 556 (App. Div. 2006), which held that insurance brokers enjoyed "learned professional" immunity and were therefore exempt from CFA liability as "semi-professionals," was still good law. Plaintiff countered that our subsequent holding in Shaw v. Shand, 460 N.J. Super. 592 (App. Div. 2019), as well as the Attorney General's interpretation of the CFA noted in that opinion, overruled Plemmons. Shaw excluded from the "learned professional" exemption licensed semi-professionals like the home inspectors involved in that case, reserving that exemption only for "those professionals who have historically been recognized as 'learned' based on the requirement of extensive learning or erudition." 460 N.J. Super. at 599.

A-4093-23

Following oral argument, the judge granted defendants' motions, dismissing the CFA count with prejudice. In an oral opinion, the judge posited that "the real question [was] whether [d]efendants as insurance brokers [were] exempt from liability under the [CFA]." The judge determined he was bound by Plemmons, explaining:

> In [Plemmons], the Appellate Division specifically concluded that insurance brokers, w[hom] they described as semi-professionals regulated by [a] separate statutory scheme[,] were not subject to claims under the [CFA]. Plaintiff relies upon the Appellate Division decision in [Shaw], which backed off the Plemmons decision in dealing with home inspectors, noting . . . [they were] not historically recognized as learned professionals.
>
> The Shaw [c]ourt concluded that a different test would apply than that considered by the Plemmons [c]ourt . . . .
>
> The [Shaw c]ourt concluded home inspectors and other licensed semi-professionals are not learned professionals merely because they're regulated, but rather they're only exempt from [CFA] claims when there is a finding . . . [of] a direct and unavoidable conflict between the regulatory scheme and the [CFA].
>
> The [c]ourt in Shaw never reversed, nor could it reverse[,] the decision in Plemmons that insurance brokers were semi-professionals subject to testing, licensing, and regulation under the statutory provisions and excluded from liability under the [CFA] for performance of brokered services.

8

The concurring opinion in Shaw of Judge Sabatino, who was also on the Plemmons panel, notes that he changes his mind on the approach to the analysis, but he does not go as far as to indicate that with respect to the exemption of insurance brokers . . . Plemmons was wrong. And specifically, Judge Sabatino notes that their licensure requirements and associated fiduciary duties are more stringent than those governing home inspectors. . . .

[This court] therefore is at least arguably faced with two competing Appellate Division decisions which [it] finds are . . . not necessarily inconsistent on this issue[. B]ut I find that given these factors that I've discussed, . . . [I am] bound to follow . . . Plemmons . . . .

The judge entered memorializing orders on July 19, 2024, and this appeal followed.

On appeal, plaintiff reprises the arguments rejected by the judge, arguing that consistent with Shaw, "the 'learned professional' exemption does not extend to insurance producers[] like [d]efendants." NJAJ supports plaintiff's position, urging us to reverse the dismissal of the CFA count. On the other hand, Audet and CFG urge us to uphold the judge's decision under either the standard articulated in Plemmons or Shaw, and Laver argues plaintiff's reliance on Shaw is misplaced because "nowhere in the Shaw decision does the [c]ourt specifically opine upon the applicability of the CFA to insurance producers."

9

## II.

"Because this interlocutory appeal arises from the Law Division's dismissal of plaintiff's CFA claim for failure to state a claim upon which relief can be granted, we review the legal issues at stake on the assumption that the facts, as alleged by plaintiff, are true." Lemelledo, 150 N.J. at 263. We "review[] de novo the trial court's determination of the motion to dismiss under Rule 4:6-2(e)" and "owe[] no deference to the trial court's legal conclusions." Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman and Stahl, P.C., 237 N.J. 91, 108 (2019).

"The CFA was enacted to 'provide[ ] relief to consumers from "fraudulent practices in the market[place]."'" Dugan v. TGI Fridays, Inc., 231 N.J. 24, 50 (2017) (first alteration in original) (quoting Lee v. Carter-Reed Co., L.L.C., 203 N.J. 496, 521 (2010)).

> The CFA vests the Attorney General with jurisdiction to enforce its provisions through a variety of mechanisms, N.J.S.A. 56:8-3 to -8, -11, -15 to -18, -20, but it also provides individual consumers with a cause of action to recover refunds, N.J.S.A. 56:8-2.11 to -2.12, and treble damages for violations, whether in good faith or otherwise, N.J.S.A. 56:8-19. The Attorney General enforces the CFA through the Division of Consumer Affairs. N.J.A.C. 13:45-1.1 to -5.6.
>
> [Lemelledo, 150 N.J. at 264 (citation reformatted).]

10

The CFA is "applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 121 (2014) (quoting Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011)). To that end, the CFA prohibits

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.
>
> [N.J.S.A. 56:8-2 (1976) (emphasis added).]

The CFA defines the term "merchandise" to include "objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c) (emphasis added). In turn, "services" has been broadly construed "to cover a wide variety of practices." Lemelledo, 150 N.J. at 264; see, e.g., Shaw, 460 N.J. Super. at 607 ("The services of a home inspector fall squarely within the [CFA's] definition of merchandise . . . ."); Quigley v. Esquire Deposition Servs., LLC, 400 N.J. Super. 494, 505 (App. Div. 2008) (holding the same for reporting services and deposition transcript sales).

11

Still, "the CFA's reach is not unbounded," and "[c]ourts have 'recognized a need to place reasonable limits upon the operation of the [CFA] "despite broad statutory language, so that its enforcement properly reflects legislative intent, however ascertained."'" Lee v. First Union Nat'l Bank, 199 N.J. 251, 262-63 (2009) (second alteration in original) (quoting DiBernardo v. Mosley, 206 N.J. Super. 371, 375 (App. Div. 1986)). One such limitation is the "learned professionals exception," "a judicially crafted rule, whereby certain transactions fall outside the CFA's purview because they involve services provided by learned professionals in their professional capacity." Id. at 263; see, e.g., Macedo v. Dello Russo, 178 N.J. 340, 346 (2004) (recognizing physicians' services as insulated from the CFA); Vort v. Hollander, 257 N.J. Super. 56, 62 (App. Div. 1992) (holding the same for attorneys' services).

Our Supreme Court formally recognized the exception in Macedo, explaining:

> Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the [CFA] despite the fact that he [or she] renders "services" to the public. And although the literal language may be construed to include professional services, it would be ludicrous to construe the legislation with that broad a sweep in view of the fact that the nature of the services does not fall into the category of consumerism.

12

> [178 N.J. at 344 (quoting Neveroski v. Blair, 141 N.J. Super. 365, 379 (App. Div. 1976)).]

In Lee, the Court expounded that "[t]he rationale underlying the learned professionals exception is that uniform regulation of an occupation, where such regulation exists, could conflict with regulation under the CFA." 199 N.J. at 264.

The Macedo Court pointed out that the Legislature had never amended the CFA to expressly include professionals and abrogate the judicial exemption, despite earlier case law articulating the exception. 178 N.J. at 345-46.

> In fact, the only major substantive change concerning the scope of the CFA came in 1976, when the Act was amended to include the sale of real estate in the definition of "merchandise."
>
> Contemporaneous with that amendment, the first judicial opinion addressing the applicability of the CFA to professionals was rendered, coincidently relating to the sale of real estate. In [Neveroski], the Appellate Division was faced with the question of whether a real estate broker who deliberately concealed the termite infestation of a home from potential buyers was subject to CFA liability. In ruling that it was not, the court relied on two basic premises. The first was that the CFA had been amended after the acts complained of specifically to include the sale of real estate, thus indicating that the prior version did not encompass that subject. Second, the court stated:
>
>> A real estate broker is in a far different category from the purveyors of products or

13

services or other activities. He is in a semi-professional status subject to testing, licensing, regulations, and penalties through other legislative provisions. See N.J.S.A. 45:15-1[ to -42]. Although not on the same plane as other professionals such as lawyers, physicians, dentists, accountants or engineers, the nature of his activity is recognized as something beyond the ordinary commercial seller of goods or services—an activity beyond the pale of the act under consideration.

[Macedo, 178 N.J. at 344 (emphasis added) (quoting Neveroski, 141 N.J. Super. at 379).]

The Macedo Court also determined that Lemelledo did not suggest a contrary conclusion regarding the applicability of the CFA to learned professionals. The Court explained:

[In Lemelledo,] in addressing loan-packing, we held that the mere existence of an alternative regulatory scheme by the Department of Banking and Insurance[] did not automatically eliminate the applicability of the CFA. Instead, we held that a direct conflict between the schemes would be required in order to conclude that the Legislature did not intend the CFA to apply. Lemelledo, 150 N.J. at 270. Lemelledo would be dispositive here if the issue presented was whether the separate regulatory scheme governing physicians preempts the application of the CFA. It is entirely irrelevant to the threshold question of whether the CFA applies to learned professionals in the first instance.

[Macedo, 178 N.J. at 345 (citation reformatted).]

14

Here, the threshold question is whether insurance brokers fit under the learned professionals exception to the CFA, categorically exempting them from liability "in the first instance." Ibid. In Plemmons, a panel of this court answered that question in the affirmative and concluded that "an insurance broker is a semi-professional, who is subject to testing, licensing and regulation under other statutory provisions, and therefore is excluded from liability under the CFA for the performance of brokerage services." 387 N.J. Super. at 556.

The Plemmons panel rejected the plaintiff's argument that Lemelledo controlled the case and dictated a contrary outcome as Lemelledo "did not involve a CFA claim against an insurance broker or other party who could be characterized as a professional or semi-professional," and Lemelledo "did not address the legislative intent . . . to exclude licensed professionals from the provisions of the CFA" recognized in Macedo and Neveroski. Plemmons, 387 N.J. Super. at 563-64 (internal quotation marks omitted) (citing Lemelledo, 150 N.J. at 265-74).

The Plemmons panel underscored that Lemelledo "had no effect upon th[e] long-standing exclusion" and concluded that

> regardless of whether there is an irreconcilable conflict
> between the CFA and the statutory provisions under
> which professionals are regulated, members of "learned
> professions," including those who occupy a "semi-

15

professional status," engage in "an activity beyond the pale of the [CFA]." Macedo, 178 N.J. at 344 (quoting Neveroski, 141 N.J. Super. at 379).

Furthermore, we are satisfied that insurance brokers are "semi-professional[s]" who are excluded from liability under the CFA for the services they render within the scope of their professional licenses. Under the Insurance Producer Licensing Act, N.J.S.A. 17:22A-26 to -48, a person "shall not sell, solicit or negotiate insurance in this State unless the person is licensed for that line of authority," N.J.S.A. 17:22A-29. A person obtains a license to "sell, solicit or negotiate insurance" by passing a written examination, N.J.S.A. 17:22A-31, and meeting the application requirements set forth in N.J.S.A. 17:22A-32. In addition, insurance brokers must comply with the Insurance Producer Standards of Conduct promulgated by the Department of Banking and Insurance. N.J.A.C. 11:17A-1.1 to 17D-2.8. These standards proscribe various "unfair trade practices," N.J.A.C. 11:17A-2.1 to -2.11, delineate an insurance producer's fiduciary duties to insureds, see N.J.A.C. 11:17A-4.1, -4.3, -4.5, -4.10, set forth requirements regarding commissions, N.J.A.C. 11:17B-2.1, fees, N.J.A.C. 11:17B-3.1 to -3.3, and management of funds, N.J.A.C. 11:17C-1.1 to -2.6, and provide penalties for violations, N.J.A.C. 11:17D-1.1 to -2.8. Therefore, insurance brokers are subject to testing, licensing and regulation comparable to real estate brokers, and thus are exempt from liability under the CFA for the reasons expressed by this court in Neveroski and reaffirmed by the Supreme Court in Macedo.

[Plemmons, 387 N.J. Super. at 564-65 (alterations in original) (citations reformatted).]

16

Thirteen years later, in <u>Shaw</u>, another panel of this court disagreed that <u>Macedo</u> "extend[ed] the [learned professional] exception to semi-professionals or licensed professionals." 460 N.J. Super. at 615 n.13. The <u>Shaw</u> panel wrote:

> The narrow issue before us is whether semi-professionals such as home inspectors should be deemed to be learned professionals. Because this case necessarily required us to interpret the scope of the "learned professional" exception to the CFA, which is a statute that is enforced by the Attorney General's office, and also because home inspectors are regulated by the Attorney General's Division of Consumer Affairs, we invited that office to participate as amicus curiae. We issued that invitation in order to discern both on a narrow basis the agency's view whether home inspectors should be deemed "learned professionals," and on a broader basis how and when the "learned professional" exception should be applied by courts to exempt individuals from CFA liability.
>
> Considering the CFA's remedial purpose and applying well-established canons of statutory construction, we conclude that the judicially created learned professional exception must be narrowly construed to exempt CFA liability only as to those professionals who have historically been recognized as "learned" based on the requirement of extensive learning or erudition. To the extent our prior decisions, including [<u>Plemmons</u>], have applied the learned professional exception to "semi-professionals" who are regulated by a separate regulatory scheme, we are constrained, upon further review, to depart from that reasoning as inconsistent with the Supreme Court's decision in [<u>Lemelledo</u>]. As the Court explicitly held in <u>Lemelledo</u>, the existence of a separate regulatory scheme will "overcome the presumption that the CFA

applies to a covered activity" only when "a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." 150 N.J. at 270.

Our decision comports with the Attorney General's persuasive interpretation of the CFA and addresses the Attorney General's policy concern that an expansive interpretation of the learned professional exception unduly curtails the authority of the Attorney General and the Division of Consumer Affairs to protect New Jersey consumers and limits the redress available to private litigants.

Accordingly, because home inspectors are not historically recognized learned professionals and because no direct and unavoidable conflict exists between the CFA and the regulations governing home inspectors, we conclude that the CFA applies to the activities of licensed home inspectors.

[Shaw, 460 N.J. Super. at 599-600.]

The Shaw panel noted that "the 'learned professional' exception recognized in Macedo, like the 'semi-professional' exception in Neveroski, focused on the 'nature of the services' provided to support its conclusion that learned professionals are not subject to CFA liability." 460 N.J. Super. at 615. Because Plemmons "did not apply the 'nature of the services' analysis," but instead "rested on the existence of a separate regulatory scheme that could possibly conflict with allegations in a CFA action," the Shaw panel criticized the standard utilized in Plemmons, reasoning that "once we define a 'learned

18

professional' as any licensed professional subject to a separate regulatory scheme, the mere existence of a separate regulatory scheme will automatically preempt the CFA without any showing of a direct and unavoidable conflict." 460 N.J. Super. at 616. The Shaw panel explained that such a conclusion could not "be squared" with Lemelledo.[2] 460 N.J. Super. at 616.

Further, the Shaw panel was "unpersuaded that the Legislature acquiesced in all semi-professional CFA immunity." Id. at 619. "Although Macedo relied in part on legislative acquiescence" to the judicially created learned professionals exception,

> it did not disturb Lemelledo's directive that the CFA presumptively applies to a covered activity absent a direct and unavoidable conflict with other regulatory schemes. Lemelledo, 150 N.J. at 270. To require the Legislature to amend the CFA each time case law extends the learned professional exception to a class of regulated semi-professionals not only unduly expands Macedo's specific holding, but also unnecessarily frustrates the Legislature's express, remedial intention that the CFA provide cumulative remedies.

---

[2] The Shaw panel expounded that the Plemmons standard "paved the way for subsequent decisions . . . holding that the mere existence of a separate regulatory scheme would automatically preempt application of the CFA." 460 N.J. Super. at 616; see, e.g., Atl. Ambulance Corp. v. Cullum, 451 N.J. Super. 247, 257 (App. Div. 2017) (holding that "ambulance service providers" are either "professionals" or "semi-professionals" "excluded from liability under the CFA for services rendered consistent with their professional license because they are regulated by the Department [of Health]").

[Shaw, 460 N.J. Super. at 619.]

Shaw agreed with the Attorney General that the "learned professional doctrine, as interpreted [in Plemmons], threatens to become the exception that swallows the rule, in contravention of the canon of statutory interpretation that requires that exceptions to a remedial statute are to be narrowly construed." 460 N.J. Super. at 618. Therefore, the Shaw panel held that

> home inspectors and other licensed semi-professionals are not learned professionals simply because they are otherwise regulated, and that they remain subject to CFA liability absent a finding that "a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." [Lemelledo, 150 N.J.] at 270.[3]
>
> [Shaw, 460 N.J. Super. at 620 (emphasis omitted).]

Judge Sabatino issued a concurring opinion in Shaw, noting that he also sat on the Plemmons panel and had "changed [his] mind" that insurance brokers were semi-professionals excluded from CFA liability. 460 N.J. Super. at 628 (Sabatino, P.J.A.D., concurring). He explained that "[u]nlike in Plemmons, in the present case our court has the benefit of the advocacy of the Attorney

---

3 The Shaw panel went on to "analyze whether anything in [the] plaintiffs' complaint [gave] rise to a direct and unavoidable conflict with the home inspector statute or regulations," but found no evidence to support a preemption defense. 460 N.J. Super. at 620-27.

General, who persuasively argues as amicus curiae why the semi-professional

distinction is problematic and appears to clash with legislative intent and the

limited Supreme Court precedent that exists on the subject." 460 N.J. Super. at

628 (Sabatino, P.J.A.D., concurring).

Judge Sabatino added:

> Even if, hypothetically, the "semi-professional" distinction were doctrinally preserved (which we are not advocating), the licensure requirements for insurance brokers—and their associated fiduciary duties—appear to me to be more stringent than those governing home inspectors.[4]  Comparatively, the grounds for a blanket occupational exemption from the CFA's anti-fraud provisions are weaker.  I say that without intending to diminish the importance of the work done by qualified professional home inspectors, who certainly provide a valuable service to home buyers and sellers.
>
> . . . .
>
> That said, this case may well present a suitable opportunity for the [Supreme] Court to provide helpful updated guidance on the contours of the learned professional doctrine.  In any event, nothing in this opinion prevents the Legislature from adopting amendments that clarify the statutory scheme.

---

[4]  Indeed, Judge Sabatino's observation is supported by the fact that N.J.S.A. 2A:53A-26(o) identifies an insurance producer as a "licensed person," like physicians, attorneys, engineers, and architects, to name a few, see N.J.S.A. 2A:53A-26, requiring the submission of an affidavit of merit to maintain a professional negligence claim pursuant to N.J.S.A. 2A:53A-27.

A-4093-23

[Id. at 628-29.]

Here, like the motion judge, we adhere to Plemmons and conclude that for purposes of the CFA, insurance brokers are categorically exempt from liability when performing brokerage services.  We reject plaintiff's contention that Shaw overruled Plemmons.  "[W]e are not bound by our earlier decisions because we do not sit en banc."  State v. Harrell, 475 N.J. Super. 545, 564 (App. Div. 2023) (quoting Liberty Mut. Ins. v. Rodriguez, 458 N.J. Super. 515, 521 (App. Div. 2019)); see also Pressler and Verniero, Current N.J. Court Rules, cmt. 3.3 on R. 1:36-3 (2025) (noting this court's "opinions clearly are binding on all [trial] courts" but do not bind "other panels of the Appellate Division").

Critically, Shaw did not involve a CFA claim against an insurance broker. The dispositive issue in Shaw was whether the judicially created exemption to CFA liability applied to home inspectors.  "Dictum is a statement . . . 'not necessary to the decision then being made . . . .'"  Bandler v. Melillo, 443 N.J. Super. 203, 210 (App. Div. 2015) (quoting Jamouneau v. Div. of Tax Appeals, 2 N.J. 325, 332 (1949)).  "[P]ortions of an opinion that are dicta are not binding." Id. at 210-11 (alteration in original) (quoting Nat'l Mortg. Co. v. Syriaque, 293 N.J. Super. 547, 554 (Ch. Div. 1994)).  Because Shaw's limiting dicta was not necessary to resolve the issue before the court, it is "entitled to due consideration

but does not invoke the principle of stare decisis." Bandler, 443 N.J. Super. at 210 (italicization omitted) (quoting Jamouneau, 2 N.J. at 332).

As acknowledged in Macedo, our conclusion is bolstered by "[l]egislative acquiescence." 178 N.J. at 346. "In construing a statute it is to be assumed that the Legislature is thoroughly conversant with its own legislation and the judicial construction placed thereon." Ibid. (quoting Quaremba v. Allan, 67 N.J. 1, 14 (1975)). "And the construction of a statute by the courts, supported by long acquiescence on the part of the Legislature . . . or failure to amend the statute, is evidence that such construction is in accord with the legislative intent." Ibid. (quoting Quaremba, 67 N.J. at 14).

The Legislature has not acted since the Plemmons holding in 2006. If the Legislature disagreed with this court's extension of the categorical exemption from CFA liability to insurance brokers, nineteen years was more than enough time for it to act. See David v. Gov't Emps. Ins. Co., 360 N.J. Super. 127, 143 (App. Div. 2003) (noting that five years was sufficient time for the Legislature to respond to a decision with which it disagreed). "If we are incorrect in our assumption, we would expect the legislature to take action to amend the statute." Macedo, 178 N.J. at 346. Based on our decision, we need not address the remaining arguments.

A-4093-23

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-4093-23