NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5686-17T1

JODI SHAW and THOMAS SHAW,

     Plaintiffs-Appellants,

v.

BRIAN SHAND and ALL POINTS
HOME INSPECTION AND
SERVICES,

     Respondents-Defendants.

_____

**APPROVED FOR PUBLICATION**

**August 15, 2019**

**APPELLATE DIVISION**

> Argued January 14, 2019 – Decided August 15, 2019
>
> Before Judges Sabatino, Haas and Mitterhoff
> (Judge Sabatino, concurring).
>
> On appeal from an interlocutory order of the Superior
> Court of New Jersey, Law Division, Sussex County,
> Docket No. L-0408-16.
>
> Linda A. Peoples argued the cause for appellants
> (Horlacher & Peoples, LLP, attorneys; Linda A.
> Peoples, of counsel and on the briefs).
>
> Wendy B. Shepps argued the cause for respondents
> (Mound, Cotton, Wollan & Greengrass LLP,
> attorneys; Wendy B. Shepps, on the briefs).
>
> Jeffrey A. Koziar, Deputy Attorney General, argued
> the cause for amicus curiae Office of the Attorney
> General (Gurbir S. Grewal, Attorney General,

attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Jeffrey A. Koziar, on the brief).

The opinion of the court was delivered by

MITTERHOFF, J.S.C. (temporarily assigned).

This interlocutory appeal arises from the trial court's June 11, 2018 order entering partial summary judgment dismissing plaintiffs Jodi and Thomas Shaw's claims under the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -210. Plaintiffs challenge the court's finding that home inspectors are "learned professionals" and therefore excluded from CFA liability.

The narrow issue before us is whether semi-professionals such as home inspectors should be deemed to be learned professionals. Because this case necessarily required us to interpret the scope of the "learned professional" exception to the CFA, which is a statute that is enforced by the Attorney General's office, and also because home inspectors are regulated by the Attorney General's Division of Consumer Affairs, we invited that office to participate as amicus curiae. We issued that invitation in order to discern both on a narrow basis the agency's view whether home inspectors should be deemed "learned professionals," and on a broader basis how and when the "learned professional" exception should be applied by courts to exempt individuals from CFA liability.

Considering the CFA's remedial purpose and applying well-established canons of statutory construction, we conclude that the judicially created learned professional exception must be narrowly construed to exempt CFA liability only as to those professionals who have historically been recognized as "learned" based on the requirement of extensive learning or erudition. To the extent our prior decisions, including Plemmons v. Blue Chip Insurance Services, Inc., 387 N.J. Super. 551 (App. Div. 2006), have applied the learned professional exception to "semi-professionals" who are regulated by a separate regulatory scheme, we are constrained, upon further review, to depart from that reasoning as inconsistent with the Supreme Court's decision in Lemelledo v. Beneficial Management Corp. of America, 150 N.J. 255 (1997). As the Court explicitly held in Lemelledo, the existence of a separate regulatory scheme will "overcome the presumption that the CFA applies to a covered activity" only when "a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." 150 N.J. at 270.

Our decision comports with the Attorney General's persuasive interpretation of the CFA and addresses the Attorney General's policy concern that an expansive interpretation of the learned professional exception unduly curtails the authority of the Attorney General and the Division of Consumer

Affairs to protect New Jersey consumers and limits the redress available to private litigants.

Accordingly, because home inspectors are not historically recognized learned professionals and because no direct and unavoidable conflict exists between the CFA and the regulations governing home inspectors, we conclude that the CFA applies to the activities of licensed home inspectors. Therefore, we reverse the trial court's summary judgment dismissal of the CFA claim against defendants and remand for further proceedings.

## I.

## A.

In April or May of 2015, plaintiff Thomas Shaw contracted to purchase a property located on Overlook Court in Hampton Township. Prior to purchasing the home, plaintiffs hired defendant[1] to conduct an inspection of the property. Karen Kleinman, plaintiffs' real estate broker, contacted defendant and requested he conduct a home inspection of plaintiffs' property. In response, defendant had Thomas Shaw sign a one-page pre-inspection agreement setting forth the terms of the inspection. That same day, defendant

---

[1] Defendant Brian Shand is the sole owner of co-defendant All Points Home Inspection and Services. We refer to Shand and All Points as "defendant."

inspected the property, and on May 13, 2015, he emailed his report to Jodi Shaw. Plaintiffs paid defendant $350 for the inspection.

Defendant's report concluded that "[t]his structure appears to be very well built utilizing quality materials and professional workmanship. It is in need of only typical maintenance and upgrading." In June 2015, plaintiffs proceeded with the purchase of the property, allegedly in reliance upon defendant's report, for the sum of $318,000. Plaintiffs allege that "[u]pon occupying the [p]roperty in June 2015, the Shaws quickly learned that the house was in fact in poor condition, requiring a great deal of major repairs." These allegedly required repairs include: "replacement of the roof that leaked and was at the end of its useful life, the repair of their front deck/porch which collapsed when they moved in, the replacement of the driveway and replacement of windows and sliding glass doors to address leaks, drafts and rot from the leaks." Plaintiffs allege they have "been forced to expend tens of thousands of dollars" on repairs and "must still, at a minimum," spend an estimated tens of thousands of dollars on a mold issue in the home.

At his deposition, defendant acknowledged that he had observed some problems with the home that he did not include in his report.

Defendant testified at his deposition that he became licensed as a home inspector in January 2015. In order to become licensed, defendant had to

attend "hours of schooling," though he did not recall how many offhand. Defendant also did not recall the name of the school he attended. In addition, defendant had to serve forty hours of apprenticeship with a licensed home inspector. Finally, in order to become licensed, defendant had to take a State-mandated test. After successfully completing the schooling and apprenticeship and passing the test, defendant became a licensed home inspector. Defendant's inspection of plaintiffs' home was his first assignment as a licensed inspector. Defendant allowed his home-inspector license to expire in April 2017; he now works as a painter, which does not require a license.[2]

In their July 2016 complaint against defendant, plaintiffs alleged claims sounding in negligence, violations of the CFA, common law fraud, and breach of contract. After the parties filed cross-motions for summary judgment, the trial court issued two orders supported by a written statement of reasons. The first order, which granted, in part, defendant's motion for summary judgment

---

[2] Defendant also holds a license issued by the Department of Labor in 1982 as a carpenter. In order to receive his carpenter's license, he underwent an apprenticeship and on-the-job training. That license, unlike the home inspector's license, does not need to be renewed.

by dismissing with prejudice plaintiffs' CFA claims, is the only order at issue in this appeal.[3]

In dismissing the CFA claims against defendant, the trial court noted that "[t]here is no binding authority specifically addressing whether home inspectors should be considered semi-professionals exempt from the CFA." The court observed that two unreported Law Division decisions[4] reasoned that "they should be [considered learned professionals] because they are regulated under N.J.A.C. 13:40[-1] et seq." The court found that our decision in Herner v. Housemaster of America, Inc., 349 N.J. Super. 89 (App. Div. 2002), which held that a home inspector was liable under the CFA, did not compel a conclusion in this case that the "learned professionals" exclusion does not apply. First, the court found Herner was factually distinguishable because in that case the inspector's reports were deliberately skewed in order to please the

---

[3] The order under review also dismissed plaintiffs' common law negligence claims. That finding is not at issue in this interlocutory appeal. Nor are the issues addressed in the second order before us.

[4] We do not cite and will not discuss those non-precedential opinions. See R. 1:36-3.

realtor, avoid "killing deals," and have real estate agents continue to recommend the home inspector.[5]

Second, the trial court found that Herner did not address the semi-professional exception issue. The court reasoned,

> Although the Home Inspection Licensing Act (N.J.S.A. 45:8-61 through 76), became effective July 8, 1998, the regulations implementing N.J.S.A. 45:8-61 et seq. were not implemented until 2006, after the decision in Herner. See 33 N.J.R. 1318(a) N.J.A.C. 13:40 et seq. These code sections highly regulate the home inspection profession, such as further specifying the requirements for initial licensure as a home inspector, including an approved course of study of 180 hours, as prescribed by the Board, 40 hours of unpaid field-based inspections in the presence of and under the direct supervision of a licensed home inspector, maintaining an errors and omissions policy in the minimum amount of $500,000 per occurrence, passing the Home Inspector Examination, and an application fee. N.J.A.C. 13:40-15.6. These are the regulations that [the unpublished opinions] cite to show that home inspectors are semi-professionals. Unlike Herner, which was decided before the 2006 regulations, both of the unpublished cases were decided after the 2006 regulations implementing N.J.S.A. 45:8-61 et seq. Although the unpublished cases are not binding on the court and are not cited as authority by the court, because home inspectors have

---

[5] We do not find this factual distinction, which speaks only to the degree of the CFA violation in Herner as compared to this case, relevant to the issue whether home inspectors are learned professionals. Presumably learned professionals are exempt from CFA liability irrespective of the relative egregiousness of their alleged conduct.

become regulated since the <u>Herner</u> decision, they should be treated as semi-professionals exempt from the Consumer Fraud Act.[6]

Citing our decision in <u>Plemmons</u>, the court concluded that defendant's status as a semi-professional exempts him from liability under the CFA. Accordingly, the court granted defendant's motion for summary judgment dismissing plaintiffs' CFA claims with prejudice.

Thereafter, we granted plaintiffs' motion for interlocutory review, limited to the issue whether home inspectors are "learned professionals" exempt from CFA liability. As we have noted, the Attorney General accepted our invitation to participate in this appeal as amicus curiae.

B.

On appeal, plaintiffs contend the trial court erred in finding that home inspectors are learned professionals. In that regard, plaintiffs primarily rely on <u>Herner</u>, which they assert is directly on point. Alternatively, plaintiffs urge us to find that because a home inspection is a service that is rendered in connection with the sale of real estate, defendant's liability is supported by the 1976 amendment to the CFA adding 'the sale or advertisement of . . . real

---

[6] We agree with the Attorney General that the trial court's reliance on the fact that the home inspector regulations were promulgated after <u>Herner</u> is unpersuasive, as the Home Inspection Professional Licensing Act became effective in 1998, four years before the <u>Herner</u> decision.

estate" to the provision of N.J.S.A. 56:8-2. See Papergraphics Intern., Inc. v. Correa, 389 N.J. Super. 8, 12 n.1 (App. Div. 2006) ("The holding in Neveroski was abrogated by the 1976 statutory amendment adding 'the sale or advertisement of . . . real estate' to the provision of N.J.S.A. 56:8-2." (alteration in original)); Arroyo v. Arnold-Baker & Assocs., Inc., 206 N.J. Super. 294, 296-97 (Law Div. 1985) (holding that the amendment to add the sale or advertisement of real estate to the CFA made real estate brokers, agents and salespersons subject to the CFA).

Defendant argues that the trial court correctly analyzed and applied our decision in Plemmons and correctly concluded that home inspectors are "learned professionals" exempt from CFA liability because they are subject to regulation by the Home Inspector Advisory Committee.[7]

The Attorney General urges us to reject the extension of the so-called "learned professional" exception to encompass "semi-professionals" such as home inspectors. The Attorney General notes that the unwarranted expansion of the "learned professional" exception to semi-professionals lacks any support in the plain text or purpose of the CFA. To adopt the trial court's reasoning, the Attorney General argues, would unduly limit the CFA, which the

---

[7] Defendant also raises a number of alleged procedural deficiencies and substantive arguments that are not pertinent to the issue before us and therefore will not be addressed.

Legislature intended to be one of the nation's strongest consumer protection laws. The trial court's broad interpretation of the exception, the Attorney General argues, significantly curtails the authority of the Attorney General and the Division of Consumer Affairs ("Division") to protect New Jersey consumers and limits the redress available to private litigants.

Contrary to the decision below, the Attorney General argues that the fact that home inspectors are subject to other statutory and regulatory requirements, which are enforced by a professional board located within the Division, does not excuse them from compliance with the CFA. In that regard, the Attorney General notes that the Legislature made clear that the rights, remedies and prohibitions of the CFA are "cumulative of any other statutory right, remedy or prohibition." N.J.S.A. 56:8-2.13. The Attorney General argues that as the Supreme Court held in Lemelledo, another statutory scheme will displace the CFA only when "a direct and unavoidable conflict exists between the application of the CFA and application of the other regulatory scheme or schemes." 150 N.J. at 270. In this case, the Attorney General avers that because there is no "direct and unavoidable conflict" between the CFA and the statutes and regulations specific to home inspectors, the trial court erred in concluding that the home inspector regulations preclude the application of the CFA to home inspectors.

A-5686-17T1

The trial court reached its result, the Attorney General asserts, by expanding the judicially created "learned professional" exception to the CFA well beyond the narrow parameters in <u>Macedo v. Dello Russo</u>, 178 N.J. 340 (2004). The expansion of the "learned professional" exception to home inspectors – who are not even required to have a college degree – stretches the exception far beyond its limited origin.[8] The Attorney General argues that the exception (which itself lacks a basis in the statutory text) should be limited to the narrow class of professionals identified in <u>Macedo</u> as exempt from the CFA for historical reasons: physicians, attorneys, and similar learned professionals who were not permitted to advertise at all when the Legislature enacted the 1960 precursor to the CFA, creating liability for fraud in advertising. Nothing in <u>Macedo</u>, the Attorney General argues, requires or even supports a CFA exemption for home inspectors on the ground that a licensure regime for home inspectors was established decades later.

## II.

## A.

Whether licensed semi-professionals such as home inspectors are entitled to the judicially created "learned professional" immunity turns on the

---

[8] With respect to educational requirements, an individual need have only a high school degree or its equivalent to become a licensed home inspector. N.J.S.A. 45:8-68(b).

statutory interpretation of two statutes: the CFA and the Home Inspection Professional Licensing Act ("HIPLA"), N.J.S.A. 45:8-61 to -81. We review these issues of statutory construction de novo. Cashin v. Bello, 223 N.J. 328, 335 (2015). In considering whether the Legislature intended to exempt home inspectors and other "semi-professionals" from liability under the CFA, we adhere to well-established principles of statutory interpretation.

"The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). In considering the statutory language, "an appellate court must read words 'with[in] their context' and give them 'their generally accepted meaning.'" Cashin, 223 N.J. at 335 (alteration in original) (quoting N.J.S.A. 1:1-1); see also DiProspero, 183 N.J. at 492 ("We ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." (citations omitted)).

When a statute's plain language lends to only one interpretation, a court should not consider "extrinsic interpretative aids." DiProspero, 183 N.J. at 492 (quoting Lozano v. Frank DeLuca Const., 178 N.J. 513, 522 (2004)). "On the other hand, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, 'including

legislative history, committee reports, and contemporaneous construction.'" Id. at 492-93 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004)).

B.

The Attorney General argues that there is nothing in the text or the purpose of the CFA that would support a blanket exception for semi-professionals based solely on the existence of a separate regulatory scheme that also regulates the subject industry. We agree.

At the outset, the CFA does not explicitly provide an exception for or even mention learned professionals. Moreover, the CFA is designed to prohibit unlawful conduct or practices, defined as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby
> . . . .
>
> [N.J.S.A. 56:8-2.]

The stated purpose of the act is "to prevent deception, fraud, or falsity, whether by acts of commission or omission, in connection with the sale or

14

advertisement of merchandise and real estate."  Fenwick v. Kay American Jeep, Inc., 72 N.J. 372, 376-77 (1977).  The CFA defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  N.J.S.A. 56:8-1(c) (emphasis added).  The services of a home inspector fall squarely within the definition of merchandise under the act.

The CFA

> has three main purposes:  to compensate the victim for his or her actual loss; to punish the wrongdoer through the award of treble damages; and by way of the counsel fee provision, to attract competent counsel to counteract the community scourge of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual.
>
> [Real v. Radir Wheels Inc., 198 N.J. 511, 520-21 (2009) (quoting Lettenmaier v. Lake Constr., Inc., 162 N.J. 134, 139 (1999)).]

"Although initially designed to combat 'sharp practices and dealings' that lured customers into purchases through fraudulent or deceptive means, the CFA is no longer aimed solely at 'shifty, fast-talking and deceptive merchant[s].'"  Suarez v. Eastern Int'l Coll., 428 N.J. Super. 10, 31 (App. Div. 2012) (alteration in original) (quoting Cox v. Sears Roebuck & Co., 138 N.J. 2, 16 (1994)).  The CFA's remedial goal "is to establish 'a broad business ethic,' promoting a standard of conduct that contemplates 'good faith, honesty

in fact and observance of fair dealing.'" Ibid. (quoting Mechinsky v. Nichols Yacht Sales, Inc. 110 N.J. 464, 472 (1988)). Accordingly, liability under the act will lie even if the prohibited conduct is committed in good faith. Ibid.

As originally enacted, the Attorney General had exclusive authority to enforce the CFA. Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 245 (2005). In 1971, however, the Legislature amended the CFA to provide for a private cause of action to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal," as a result of a deceptive practice. N.J.S.A. 56:8-19. If successful, the private litigant can recover treble damages, attorney's fees, and costs. Ibid. The Legislature has expressly provided that the "rights, remedies and prohibitions" created by the CFA are "in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State." N.J.S.A. 56:8-2.13.

The CFA "evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." Lemelledo, 150 N.J. at 264; see also Czar, Inc. v. Heath, 198 N.J. 195, 208-09 (2009) (rejecting "crabbed" approach to the CFA in favor of a faithful adherence to the CFA's broad remedial purposes); Cox, 138 N.J. at 15 (holding that the CFA must be construed liberally in favor of consumers).

Furthermore, it is well-established that "where the purpose of legislation is remedial and humanitarian, any exemption must be narrowly construed, giving due regard to the plain meaning of the language and the legislative intent."  Serv. Armament Co. v. Hyland, 70 N.J. 550, 559 (1976) (citing Phillips v. Walling, 324 U.S. 490, 493 (1945)); see also Nini v. Mercer Cty. Cmty. Coll., 202 N.J. 98, 112 (2010) ("[A]n interpretation that throws contract employees into the over-seventy exception at once narrows what should be the expansive coverage of remedial legislation like the [New Jersey Law Against Discrimination], and expands an exception in contravention of applicable principles of statutory construction."); Young v. Schering Corp., 141 N.J. 16, 29 (1995) ("As an exception to the general remedial scheme of [the New Jersey Conscientious Employee Protection Act], the waiver provision must be construed narrowly."); Marx v. Friendly Ice Cream Corp., 380 N.J. Super. 302, 310 (App. Div. 2005) ("Based upon the Legislature's remedial purpose in enacting a minimum wage law, we have held that all exemptions to N.J.S.A. 34:11-56a4 should be construed narrowly and that the employer has the obligation to prove that an employee meets the criteria for exemption.").  As the United States Supreme Court has explained, "[t]o extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse

the interpretative process and to frustrate the announced will of the people." Phillips, 324 U.S. at 493.

Thus, broadly construing the reach of the CFA as a remedial statute, and narrowly construing any exceptions to the CFA, we agree with the Attorney General that there is nothing in the text or the purpose of the CFA that supports an exemption for fraudulent or unconscionable activities of semi-professionals such as home inspectors.

## C.

In 1997, the Supreme Court in Lemelledo specifically addressed the issue of whether a comprehensive statutory scheme regulating a class of individuals or entities would place that class beyond the reach of the CFA. 150 N.J. at 266. Lemelledo was a class action brought against a commercial lender who engaged in the practice of "loan packing," which increases the principal amount of the loan with loan-related services, such as credit insurance, that the borrower does not want. Id. at 259-60. The trial court dismissed the complaint for failure to state a claim under which relief can be granted. Id. at 262. The Supreme Court disagreed and reinstated the plaintiff's CFA claims. Id. at 275.

The Court observed that although the CFA "vests the Attorney General with jurisdiction to enforce its provisions through a variety of mechanisms,

N.J.S.A. 56:8-3 to -8, -11, -15 to -18 & -20," the Act also expressly "provides individual consumers with a private cause of action to recover refunds, 56:8-2.11 to -2.12, and treble damages for violations, whether in good faith or otherwise, N.J.S.A. 56:8-19." Id. at 264. In that regard, the Court observed that the plain language of the CFA declares that "[t]he rights, remedies and prohibitions accorded by the provisions of this act are hereby declared to be in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State." Ibid. (quoting N.J.S.A. 56:8-2.13)

The Court rejected the defendant's argument that no CFA liability could attach because neither the CFA nor its implementing regulations had specifically included sales of insurance, reasoning that "the CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations." Id. at 265. The Court concluded that "[b]ecause the broad language of the CFA appears to include both lending and insurance-sales practices, . . . its terms also include the sale of insurance in conjunction with lending, that is, loan packing." Id. at 266.

The Court also found, however, that its conclusion that the CFA's language encompassed loan packing did "not automatically resolve the issue of

the CFA as a basis for remedial relief." Id. at 266. "Instead, a court must look to whether a 'real possibility' of conflict would exist if the CFA were to apply to a particular practice, regardless of the number of agencies with regulatory jurisdiction over that practice." Id. at 268. The Court reasoned that in light of the "strong and sweeping legislative remedial purpose" of the CFA and the expectation that consumers will act as private attorneys general, there is a presumption that the CFA applies to the covered practice at issue. Ibid. To find that non-consumer statutes and regulations preempt the CFA, a court must determine that "a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." Id. at 270 (emphasis added). The court "must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes." Ibid. The Court further "stress[ed] that the conflict must be patent and sharp, and must not simply constitute the mere possibility of incompatibility." Ibid. The Court explained,

> If the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in combatting clear forms of fraud simply because those

fraudulent practices happen also to be covered by
some other statute or regulation.

[Ibid.]

III.

A.

With the foregoing statutory and common law background in mind, we now turn to a review of the origin and evolution of the "learned professional" exception to CFA liability.

> Originally, and historically, the word "profession" was applied only to law, medicine and theology or divinity, and these were known as the three "learned professions," and it has frequently been said that formerly these were known as "the professions."
>
> [Plaza Bottle Shop, Inc. v. Al Torstrick Insurance Agency, 712 S.W.2d 349, 351 (Ky. Ct. App. 1986) (quoting 72 C.J.S. Professions §§ 4-5 (1951)).]

See also Webster's Unabridged Dictionary of the English Language 1095 (2001) (defining "learned profession" as "any of the three professions, theology, law and medicine, commonly held to require highly advanced learning"). It is indisputable that a home inspector, who requires only a high school diploma or its equivalent, is not a learned professional in the historic sense.

As the Attorney General notes, the learned professional exemption to CFA liability is an atextual, judicially created doctrine. The seed of the

21                                                                          A-5686-17T1

judicially created "learned professional" exception to CFA liability was first planted in Neveroski v. Blair, 141 N.J. Super. 365 (App. Div. 1976). The central issue in Neveroski was whether real estate sales fell within the CFA's definition of "merchandise." See id. at 375-76.[9] In finding that the CFA's reference to "merchandise" did not encompass the sale of real estate, we noted that in 1967 a bill was introduced expanding the definition of "merchandise" to include "any objects, wares, goods, commodities, real estate, securities, services, or anything offered directly or indirectly to the public for sale." Id. at 377 (quoting A. 715 (1967)). The bill as adopted, however, was amended to delete the words "real estate, securities." Ibid. We found the deletion of "real estate" and "securities" represented a meaningful act on the part of the Legislature "eliminating these two areas of commercial activity from the purview of the statute." Id. at 378.[10]

---

[9]  In Neveroski, there was substantial evidence that Blue Ribbon concealed from the plaintiffs the fact that the home they were purchasing had extensive termite damage. Id. at 375. Thus, we observed that "[o]ur review of the record satisfies us that if the act encompasses within its ambit deceptive, unconscionable or fraudulent acts in connection with the sale of real estate, there is sufficient credible evidence to sustain a violation thereof by Blue Ribbon." Id. at 376.

[10]  We recognized, however, that "a possible alternative construction to the effect that the deletion was made because of an assumption that the express words were unnecessary in view of the catch-all phrase 'or anything offered, directly or indirectly, to the public for sale.'" Ibid. That alternative

(continued)

[I]t is our considered opinion that the entire thrust of the Consumer Fraud Act is pointed to goods and services sold to consumers in the popular sense. Such consumers purchase products from retail sellers of merchandise consisting of personal property of all kinds or contracts for services of various types brought to their attention by advertising or other sales techniques. The legislative language throughout the statute and the evils sought to be eliminated point to an intent to protect the consumer in the context of the ordinary meaning of that term in the market place.

[Ibid.]

In addition, under the doctrine of ejusdem generis,[11] we found that real estate was "wholly foreign to any of the listed examples specifically referred to in the definition." Id. at 379.

A real estate broker is in a far different category from the purveyors of products or services or other activities. He is in a semi-professional status subject to testing, licensing, regulations and penalties through other legislative provisions. Although not on the same plane as other professionals such as lawyers, physicians, dentists, accountants or engineers, the nature of his activity is recognized as something beyond the ordinary commercial seller of goods or services – an activity beyond the pale of the act under consideration.

---

(continued)
construction appears to be in line with the Attorney General's position that pursuant to Lemelledo the CFA presumptively applies.

[11] Of the same kind or class. See Black's Law Dictionary 654 (11th ed. 2019).

> Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the Consumer Fraud Act despite the fact that he renders "services" to the public. And although the literal language may be construed to include professional services, it would be ludicrous to construe the legislation with that broad a sweep in view of the fact that <u>the nature of the services does not fall into the category of consumerism</u>.
>
> Similarly, in the absence of clear and explicit language in the statute, a broker who negotiates the sale of real estate and thereby renders "services" is nevertheless outside the scope of persons sought to be covered by the Act.
>
> [<u>Id.</u> at 379-80 (emphasis added) (citation omitted).]

Pertinent to the issues before us on this appeal, in <u>Neveroski</u> we recognized that semi-professionals are not on the same plane as other professions historically recognized as being "learned professions." <u>Id.</u> at 379. In addition, our focus in <u>Neveroski</u> was on the "nature of the services," not the extent to which a particular semi-professional was otherwise regulated. <u>Ibid.</u>

Two months before the <u>Neveroski</u> decision was issued, the Legislature amended the CFA to include the use of any of the prohibited acts "in connection with the sale or advertisement of any merchandise or real estate." <u>Id.</u> at 377 n.3. <u>Neveroski</u> acknowledged the statutory amendment in footnote 3 to the opinion. In that footnote, it notes that the Governor issued a statement in connection with the passage of the bill asserting that the amendment was not

meant to change the law because "real estate was included in the legislation as it existed prior to the amendment." Ibid. Despite the Legislature's abrogation of Neveroski's holding, subsequent decisions of this court have seemingly accorded its semi-professional exemption precedential weight.

In 2004, in Macedo, the New Jersey Supreme Court held in a short per curiam opinion that the CFA did not apply to a physician's advertisements. 178 N.J. at 346. The Court concluded that the Legislature "obviously" did not intend the CFA "to encompass advertising by professionals when it enacted the CFA in 1960 because advertising by physicians because such advertising was not permitted for another two decades." Id. at 343. The Court explained that advertising by professionals did not begin in earnest until after 1977, when the United States Supreme Court ruled that a blanket ban on attorney advertising violated the First Amendment. Ibid. (citing Bates v. State Bar of Arizona, 433 U.S. 350, 383 (1977)). The Court also noted that the Legislature has not amended the CFA to include advertising by learned professionals. Id. at 344.[12] The Supreme Court thus held that "advertisements by learned professionals in respect of the rendering of professional services are insulated from the CFA

---

[12] The Court implicitly approved our holding in Vort v. Hollander, 257 N.J. Super. 56, 62 (App. Div. 1992), that attorney's services are beyond the reach of the CFA.

but subject to comprehensive regulation by the relevant regulatory bodies and to any common-law remedies that otherwise may apply." Id. at 346.

Far from overruling Lemelledo, however, the Court in Macedo expressly reaffirmed its prior holding that, absent a direct and unavoidable conflict, a separate regulatory scheme does not render the CFA inapplicable:

> Nothing in Lemelledo suggests a contrary conclusion. There, in addressing loan-packing, we held that the mere existence of an alternative regulatory scheme by the Department of Banking and Insurance, did not automatically eliminate the applicability of the CFA. Instead, we held that a direct conflict between the schemes would be required in order to conclude that the Legislature did not intend the CFA to apply. Lemelledo would be dispositive here if the issue presented was whether the separate regulatory scheme governing physicians preempts the application of the CFA. It is entirely irrelevant to the threshold question of whether the CFA applies to learned professionals in the first instance.
>
> [Id. at 345 (citation omitted) (emphasis added).]

Thus, the "learned professional" exception recognized in Macedo, like the "semi-professional" exception in Neveroksi, focused on the "nature of the services" provided to support its conclusion that learned professionals are not

subject to CFA liability.[13]   No Supreme Court decision has revisited the learned professional doctrine since the Court decided <u>Macedo</u>.[14]

Thirty years after <u>Neveroski</u>, the issue whether the "learned professional" immunity recognized in <u>Macedo</u> should be extended to semi-professionals resurfaced in <u>Plemmons</u>, 387 N.J. Super. at 556.[15]  In <u>Plemmons</u>, we "conclude[d] that an insurance broker is a semi-professional, who is subject to testing, licensing and regulation under other statutory provisions, and therefore is excluded from liability under the CFA for the performance of brokerage services." <u>Ibid.</u>

In so holding, we differentiated that case from <u>Lemelledo</u>, because <u>Lemelledo</u> "did not include a CFA claim against . . . [a] party who could be characterized as 'professional' or 'semi-professional.'" <u>Id.</u> at 563.  In deciding insurance brokers were learned professionals, the court noted that they must be licensed, pass an examination, meet application requirements, comply with

---

[13]  <u>Macedo</u> did not, however, extend the exception to semi-professionals or licensed professionals.

[14]  The Court has twice commented, in dicta, on the learned professional exception, but resolved both of those cases on other grounds.  <u>See</u> <u>Manahawkin Convalescent v. O'Neill</u>, 217 N.J. 99, 123-24 (2014); <u>Lee v. First Union Nat. Bank</u>, 199 N.J. 251, 263-64 (2009).

[15]  In <u>Plemmons</u>, we addressed a number of issues in addition to whether insurance brokers were learned professionals.  Those separate rulings are not affected by our decision today.

standards of conduct that delineate "unfair trade practices" and other requirements, and overall are "subject to testing, licensing and regulation comparable to real estate brokers, and thus are exempt from liability under the CFA[.]" Id. at 564-65.

Thus, in Plemmons, we did not apply the "nature of the services" analysis that formed the basis for the "semi-professional" exemption in Neveroski and the "learned professional" exemption in Macedo. Instead, the basis of the semi-professional exception in Plemmons rested on the existence of a separate regulatory scheme that could possibly conflict with allegations in a CFA action. See ibid. Plemmons thus paved the way for subsequent decisions, including the trial court's decision in this case, holding that the mere existence of a separate regulatory scheme would automatically preempt application of the CFA. See, e.g., Atlantic Ambulance Corp. v. Cullum, 451 N.J. Super. 247, 257-58 (App. Div. 2017) (holding that ambulance service providers excluded from liability under the CFA for services rendered consistent with their professional license because they are regulated by the Department of Health). But see Manahawkin, 217 N.J. at 124 (in which the Supreme Court expressed "serious doubt" that the nursing home's billing and collection function, which was at issue in the case, "would qualify for the learned professionals exception to the CFA").

As the Attorney General points out, however, the standard in <u>Plemmons</u> cannot be squared, on further reflection, with the Supreme Court's holding in <u>Lemelledo</u>, a holding that was reaffirmed by the Supreme Court in <u>Macedo</u>. That <u>Lemelledo</u> did not involve services by a licensed professional is an empty distinction; once we define a "learned professional" as any licensed professional subject to a separate regulatory scheme, the mere existence of a separate regulatory scheme will automatically preempt the CFA without any showing of a direct and unavoidable conflict. <u>Lemelledo</u> is a Supreme Court decision that remains the applicable standard for preemption.

Significantly, the Attorney General takes the position that <u>Lemelledo</u>, and not <u>Plemmons</u>, sets forth the appropriate standard for evaluating whether a separate regulatory scheme preempts the CFA. The Attorney General notes that the <u>Plemmons</u> standard unduly hinders the State's effective enforcement of the CFA and unjustifiably immunizes large categories of the public from their commission of fraud and other unconscionable conduct.

Although we are not ultimately bound by an agency's statutory interpretation, "[g]enerally, courts afford substantial deference to an agency's interpretation of a statute that it is charged with enforcing." <u>Univ. Cottage Club of Princeton N.J. Corp. v. Dep't of Envtl. Prot.</u>, 191 N.J. 38, 48 (2007); <u>see also</u> <u>Merin v. Maglaki</u>, 126 N.J. 430, 436-37 (1992) ("We give substantial

deference to the interpretation of the agency charged with enforcing an act. The agency's interpretation will prevail provided it is not plainly unreasonable.").

Accordingly, although we are not bound by the Attorney General's interpretation of the CFA, "it is nonetheless entitled to a degree of deference, in recognition of the Attorney General's special role as the sole legal adviser to most agencies of State Government," including the Division of Consumer Affairs. Quarto v. Adams, 395 N.J. Super. 502, 513 (App. Div. 2007) (citing N.J.S.A. 52:17A-4(e)); see also Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 70 (1978); Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist. v. Bd. of Educ. of Delran, 361 N.J. Super. 488, 493-94 (App. Div. 2003).

The Division of Consumer Affairs is responsible not only for enforcing the CFA but, in addition, under the Uniform Enforcement Act ("UEA"), N.J.S.A. 45:1-14 to -27, the Attorney General and the Director of the Division of Consumer Affairs are also responsible for ensuring that the HIPLA and its implementing regulations are enforced in a manner consistent with applicable law. N.J.S.A. 45:1-17 and -18. Both the CFA and the UEA are remedial statutes intended to protect the public. See Cox, 138 N.J. at 15 (noting that the CFA is "remedial legislation"); N.J.S.A. 45:1-14 (providing that the UEA "is deemed remedial, and the provisions hereof should be afforded a liberal

construction").  Because the Attorney General is charged with enforcing both the CFA and the HIPLA, we find his opinion particularly persuasive in this case.

Moreover, unless plainly unreasonable, we defer to both the Attorney General's and the Division's persuasive interpretation of these laws.  See, e.g., N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J. 331, 351 (1997) ("We have consistently accorded substantial deference to the interpretation of the agency charged with enforcing an act." (internal quotation marks omitted)); Merin,126 N.J. at 436-37 (giving "substantial deference" to the Insurance Commissioner's interpretation of an anti-fraud statute); In re Johnny Popper, Inc., 413 N.J. Super. 580, 589 (App. Div. 2010) (recognizing the expertise of the Division, which is charged with the responsibility of enforcing the CFA); Degnan v. Nordmark & Hood Presentations, Inc., 177 N.J. Super. 186, 192 (App. Div. 1981) (giving "due deference" to the Division's interpretation of the Charitable Fund Razing Act of 1971 and its determination that the defendants were professional fund raisers within the meaning of the statute).

Finally, we defer to the Attorney General's and the Division's interpretation of the relevant authorities "[e]ven though this appeal does not arise from a final agency determination" and the agency's position is instead

set forth in an amicus brief.  <u>U.S. Bank, N.A. v. Hough</u>, 210 N.J. 187, 200 (2012).

We agree with the Attorney General that the learned professional doctrine, as interpreted, threatens to become the exception that swallows the rule, in contravention of the canon of statutory interpretation that requires that exceptions to a remedial statute are to be narrowly construed.  We also agree with the Attorney General's argument that, to the extent the Supreme Court continues to recognize a "learned professional" doctrine, ideally that doctrine should be narrowly construed to include only those professions who have historically been recognized as "learned" based on the requirement of extensive learning or erudition.

We are unpersuaded that the Legislature acquiesced in all semi-professional CFA immunity.  As the Supreme Court observed in <u>Lemelledo</u>,

> Defendant places great significance on the failure of the CFA and its implementing regulations specifically to include insurance.  That omission, however, is far from determinative.  Given that "[t]he fertility of human invention in devising new schemes of fraud is so great . . . ," <u>Kugler v. Roman</u> 58 N.J. 522, 543 n.4 (1971), the CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations. <u>See</u> <u>Federal Trade Comm'n v. Sperry & Hutchinson Co.</u>, 405 U.S. 233, 240 (1972) ("Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over

again[, constituting] . . . an endless task.") (citation and quotations omitted).

[150 N.J. at 265-66 (alterations in original).]

Although Macedo relied in part on legislative acquiescence to the judicially created rule that "learned professionals [are] beyond the reach of the Act so long as they are operating in their professional capacities[,]" 178 N.J. at 346-47, it did not disturb Lemelledo's directive that the CFA presumptively applies to a covered activity absent a direct and unavoidable conflict with other regulatory schemes.  Lemelledo, 150 N.J. at 270.  To require the Legislature to amend the CFA each time case law extends the learned professional exception to a class of regulated semi-professionals not only unduly expands Macedo's specific holding, but also unnecessarily frustrates the Legislature's express, remedial intention that the CFA provide cumulative remedies.  As the Court noted in Lemelledo:

> In the modern administrative state, regulation is frequently complementary, overlapping, and comprehensive.  Absent a nearly irreconcilable conflict, to allow one remedial statute to preempt another or to co-opt a broad field of regulatory concern, simply because the two statutes regulate the same activity, would defeat the purposes giving rise to the need for regulation.
>
> [Id. at 271.]

Giving due deference to the Attorney General's concern that a wide-ranging interpretation of the learned profession exception would unfairly restrict the ability of private litigants and the Division to seek redress for fraudulent commercial practices, we find no reason to depart from Lemelledo's distinct holdings in the context of licensed semi-professionals.

For these reasons, we hold that home inspectors and other licensed semi-professionals are not learned professionals simply because they are otherwise regulated, and that they remain subject to CFA liability absent a finding that "a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." Id. at 270 (emphasis added).

B.

Of course, pursuant to Lemelledo, any defendant may assert a preemption defense if the facts so warrant. Lemelledo itself recognized there may be situations where the allegations in a CFA complaint and compliance with a separate regulatory scheme may pose an irresolvable conflict. See id. at 274. The issue of any such alleged unavoidable conflict must be determined on a case-by-case basis, comparing the plaintiff's factual allegations with the specific statutes and regulations that govern the defendant. In that vein, although defendant did not identify in this case any specific conflict between

A-5686-17T1

plaintiffs' complaint and the HIPLA, for completeness we will now analyze whether anything in plaintiffs' complaint gives rise to a direct and unavoidable conflict with the home inspector statute or regulations.

In that regard, we "must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes." Id. at 270. In order to find preemption, "the conflict must be patent and sharp, and must not simply constitute the mere possibility of incompatibility." Ibid.

The Legislature passed the HIPLA, N.J.S.A. 45:8-61 to -81, in 1997. The HIPLA created a Home Inspection Advisory Committee ("Committee") within the Division, under the State Board of Professional Engineers and Land Surveyors. N.J.S.A. 45:8-63. The act sets forth, among other things: (1) the powers and duties of the Committee, N.J.S.A. 45:8-66; (2) the licensure requirements for home inspectors, N.J.S.A. 45:8-69; and (3) the grounds for denying, suspending, or revoking a home inspector license, N.J.S.A. 45:8-74. The act appears to provide a private right of action, N.J.S.A. 45:8-76.1, but does not specifically provide for civil penalties, consumer restitution, or reimbursement of attorneys' fees and costs.

The HIPLA does not provide any enforcement provision, therefore the Attorney General rests upon the relevant provisions of the UEA, N.J.S.A. 45:1-14 to -27, to provide its enforcement authority. These provisions empower the Division with uniform investigative and enforcement powers for home inspectors, N.J.S.A. 45:1-17 and -18, as the Committee is located within the Division, and provide for civil penalties up to $10,000 for the first violation and $20,000 for subsequent violations, N.J.S.A. 45:1-22(b) and -25(a). N.J.S.A. 45:1-22(d) provides for consumer restitution up to the amount received by the licensee, and N.J.S.A. 45:1-25(d) provides for cost reimbursement for use of the State, including attorneys' fees. Under the UEA, the Attorney General retains authority to ensure that all such professional and occupational boards are acting in a manner consistent with applicable law. N.J.S.A. 45:1-17(c).

The Home Inspector Regulations, N.J.A.C. 13:40-15.1 to -15.23, were promulgated by the Division in 2006 pursuant to the HIPLA. The regulations set forth: (1) the requirements for initial licensure as a home inspector, N.J.A.C. 13:40-15.6; (2) the insurance requirements for home inspectors, N.J.A.C. 13:40-15.8; (3) continuing education requirements, N.J.A.C. 13:40-15.14; (4) pre-inspection agreement requirements, N.J.A.C. 13:40-15.15; (5) detailed standards of practice for home inspectors including requirements for

A-5686-17T1

the home inspection report, N.J.A.C. 13:40-15.16; (6) requirements of advertising by home inspectors, N.J.A.C. 13:40-15.18; (7) prohibited practices by home inspectors, N.J.A.C. 13:40-15.19; and (8) the grounds for suspending, revoking or refusing to renew a home inspector's license, N.J.A.C. 13:40-15.20.

Among the prohibited practices enumerated in N.J.A.C. 13:40-15.19(a) are:

> 13.  Engage in the use of advertising which contains any statement, claim or format which is false, fraudulent, misleading or deceptive;
>
> . . . .
>
> 20.  Perform any act or omission involving dishonesty, fraud, or misrepresentation with the intent to benefit a licensee or other person or with the intent to substantially injure another person;
>
> 21.  Perform any act or omission involving dishonesty, fraud, or misrepresentation in the performance of a home inspection or the preparation of a home inspection report;
>
> . . . .
>
> 23.  Fail or refuse, without good cause, to exercise due diligence in preparing a home inspection report, delivering a report to the client, or responding to an inquiry from the client.

Considering these provisions, we address the issue whether there is a conflict as defined by Lemelledo. In that regard, the Supreme Court in

Lemelledo set forth a stringent standard that is akin to federal preemption of state laws.

At the outset, there is no express preemption established by either the CFA or the HIPLA. Cf. Gordon v. United Continental Holding, Inc. 73 F.Supp.3d 472, 479-80 (D.N.J. 2014) (finding that the Airline Deregulation Act of 1978 by its terms, 49 U.S.C. § 4171(b)(1), expressly preempted the plaintiffs' CFA claims). To the contrary, the CFA provides that the remedies under the act are "cumulative of any other statutory right, remedy or prohibition." N.J.S.A. 56:8-2.13.

In an analogous context, in Union Ink Co. v. AT&T Corp., 352 N.J. Super. 617, 638-42 (App. Div. 2002), we held that the plain language of the Communications Act defeated the defendants' CFA preemption argument. The plaintiffs alleged that AT&T fraudulently misrepresented that it utilized "the largest digital network in America" and that the quality and reliability of its service would be as good as their conventional land line service. Id. at 625. In rejecting the defendants' claim of preemption, we noted that the Communications Act provided that

> no state or local government shall have any authority to regulate the entry of the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating other terms and conditions of commercial mobile services.

[<u>Id.</u> at 628 (emphasis added) (quoting 47 U.S.C. § 332 (c)(3)(A)).]

We held that the plaintiffs' claims fell under the "other terms and conditions" rubric of the statute and were therefore not barred. <u>See id</u>. at 638, 643. Similarly, the CFA contains an express reservation of litigants' rights under other statutory and common law provisions, N.J.SA. 56:8-2.13, and the HIPLA contains no provision evincing an intent to fully occupy the field of home inspector regulation.

Having found no express preemption, we address whether the HIPLA and its implementing regulations would support implied preemption of plaintiffs' CFA claim. The question whether a statute is preempted is a fact-sensitive endeavor. <u>R.F. v. Abbott Labs</u>, 162 N.J. 596, 619 (1999). Preemption "is not to be lightly presumed." <u>Ibid.</u> (quoting <u>Turner v. First Union Nat'l Bank</u>, 162 N.J. 75, 87 (1999)). The party asserting preemption bears the burden of establishing its entitlement to the defense. <u>Id.</u> at 645 (citing <u>Franklin Tower One, L.L.C. v. N.M.</u>, 157 N.J. 602, 615-16 (1999)).

> There are three types of implied preemption: (1) field preemption, "where the scheme of federal law and regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it;'" (2) conflict preemption, where there is a conflict between federal and state law, rendering "'compliance with both federal and state regulations . . . a physical impossibility;'" and (3) preemption where "state law impedes the achievement of a federal

objective;" in this case, even if federal and state law are "not mutually exclusive . . . preemption will be found if state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" As with the three general types of preemption, these categories are not perfectly distinct, and in practice often overlap.

[Id. at 620 (alterations in original) (citations omitted).]

Thus, the issues are: (1) whether the HIPLA's regulation of home inspectors is so pervasive as to render CFA liability inapplicable; (2) whether there is conflict between the CFA and the HIPLA that renders compliance with both a physical impossibility; and (3) whether the application of the CFA to home inspectors would impede the achievement of the HIPLA's objectives.

Daaleman v. Elizabethtown Gas Co., 77 N.J. 267 (1978), is often cited as a case where the Supreme Court held that a regulatory scheme preempted a CFA claim. Daaleman was a class action against Elizabethtown Gas Co. ("Elizabethtown"), a privately owned public utility corporation operating under the jurisdiction of the Board of Public Utility Commissioners of the State of New Jersey ("PUC") pursuant to the Public Utilities Act. 77 N.J. at 268-70. Although Elizabethtown's rates were fixed by PUC, an administrative order allowed utilities such as Elizabethtown to include in its tariff a Purchased Gas Adjustment Clause allowing it to make automatic adjustments in its customer billings to account for variations in the cost of purchasing and storing gas. Id.

at 270 (citing N.J.A.C. 14:11-1.13). PUC required Elizabethtown to submit detailed statements of any cost figures and adjustments to its tariff pursuant to the order. Ibid. The Daaleman class action alleged Elizabethtown overcharged customers under the Purchased Gas Adjustment Cause. Ibid.

Under those unique facts, the Supreme Court held that plaintiffs' CFA action was preempted by the PUC regulations. Id. at 271. In that regard, the Court reasoned that

> a Purchased Gas Adjustment Clause is a tariff mechanism, permitted under PUC's administrative order. Application of the clause involves interpretation of the PUC administrative order and regulations. Its use is subject to PUC supervision and control. Misuse of this type of clause, whether intentional or otherwise, and the remedies therefor are matters as to which PUC has been vested with exclusive jurisdiction.
>
> [Ibid. (emphasis added).]

The Court held that were Elizabethtown's use of the Purchased Gas Adjustment Clause be subject to challenge under the CFA, "separate state agencies would have the right to exercise concurrent jurisdiction and control over Elizabethtown's billings, with a real possibility of conflicting determinations, rulings and regulations affecting the identical subject matter." Id. at 272.

A-5686-17T1

Significantly, Justice Pashman's concurring opinion in Daaleman notes that Elizabethtown's immunity is limited to matters involving rate setting. Id. at 274 (Pashman, J., concurring). In that regard, Justice Pashman clarified that "a regulated utility may nevertheless be covered by [the CFA] when it engages in commercial activity not governed by the comprehensive scheme of PUC rate regulation." Ibid.

> There is no valid reason why a utility, simply by reason of the fact that it is subject to regulation of its rates in the public interest, should be exempt from the Act if it should commit fraud in connection with the marketing of merchandise. To take a currently obvious example, the telephone company's persistent efforts to convince consumers to purchase "personalized," custom-designed phones are no different from the attempts of any other manufacturer to effectively advertise and sell its products. Suppliers of fuel will often sell related equipment, such as oil burners, fuel tanks or gas and electric ranges in connection with their regulated activity. Conduct of this type should not be exempt from N.J.S.A. 56:8-2 merely because of the fortuitous circumstance that the vendor involved is a utility subject to PUC regulation on unrelated matters. If a utility engages in practices of the type proscribed by the Consumer Fraud Act, N.J.S.A. 56:8-2, it should be subject to the same penalties as any other vendor.
>
> [Ibid.]

Thus, Daaleman did not accord blanket CFA immunity to Elizabethtown, but only immunity from claims related to rate-setting.

A-5686-17T1

Turning to the facts in this case, plaintiffs allege defendant failed to disclose in his report significant problems of which he was aware, and that as a result plaintiffs have sustained substantial economic loss. Although the allegations essentially mirror the violation enumerated in N.J.A.C. 13:40-15.19(a)(21), they cannot be said to conflict with the regulation; rather the CFA action is supplemental to and in furtherance of the remedies of the HIPLA, as the Legislature intended. In that regard, as in this case, a violation of the regulation may permissibly be presented as evidence (although not conclusive) that the home inspector also violated the CFA. See Reyes v. Egner, 404 N.J. Super. 433, 458 (App. Div. 2009) (discussing "established precedents treating statutory or regulatory violations as non-dispositive proof of negligence"), aff'd, 201 N.J. 417 (2010).

Moreover, there is no provision in the statute and regulations that provides the committee with the comprehensive oversight of a home inspector's conduct, as was the case in public utility rate-setting cases such as Daaleman. In that regard, home inspectors do not submit documentation of their work, such as their reports, to the Committee for review. Nor does the agency inspect home inspectors' work on a routine basis or set their rates.

Beyond this, as the Attorney General notes, the scope of the Home Inspector Regulations is not as broad as the CFA. For example, while the

Home Inspector Regulations address the advertising of home inspector services, N.J.A.C. 13:40-15.18 and -15.19(a)(13), they do not expressly cover the sale of such services. Thus, language in a home inspection contract requiring the consumer to waive his or her rights under federal or state law might be found to be unconscionable or deceptive under the CFA with no similar prohibition in the Home Inspector Regulations.

In addition, as to a private litigant, the CFA provides for greater potential monetary recovery in the form of treble damages, N.J.S.A. 56:8-19, as compared with the UEA, which would appear to limit restitution to reimbursement of the $350 plaintiffs paid for the inspection, N.J.S.A. 45:1-22(d). Thus, recovery under the CFA would not conflict, but be supplemental to and complementary to, the remedies afforded to the State under the HIPLA. In that regard, there is no mechanism under the HIPLA to make plaintiffs whole. In cases where damages are limited, this would create a disincentive for attorneys to pursue claims against unscrupulous home inspectors – which is the precise reason the Legislature amended the statute to create a private cause of action in the first place.

In short, there is simply no evidence that the HIPLA's regulation of home inspectors is so pervasive as to render CFA liability inapplicable; no evidence of a conflict between the CFA and the HIPLA that renders

compliance with both a physical impossibility; and no evidence that the application of the CFA to home inspectors would impede the achievement of the HIPLA's objectives. Thus, we discern no conflict, let alone a direct and unavoidable conflict, that would bar plaintiffs' claims.

C.

In summary, considering the CFA's remedial intent and that exceptions to remedial statutes must be narrowly construed, we decline to extend the learned professional exception to licensed home inspectors simply because they are regulated by the HIPLA. Giving due deference to the Attorney General's and Division's authority to enforce the CFA, we discern no reason to disagree with the Attorney General that the learned professional exception should be limited only to historically recognized learned professionals, such as doctors, as recognized in Macedo.

We similarly agree with the Attorney General that Lemelledo sets forth the appropriate test by which to evaluate whether the existence of a separate regulatory scheme exempts a class of semi-professionals from the CFA's sweeping reach. Applying Lemelledo's test in this case, we have uncovered no direct and unavoidable conflict between the CFA and the HIPLA, and find that defendant has not overcome the presumption that the CFA applies to his

services as a licensed home inspector. We thus reverse the trial court's dismissal of plaintiffs' CFA claims.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

_____

**SABATINO, P.J.A.D., concurring.**

For the reasons expressed in Judge Mitterhoff's well-crafted opinion, I join with my colleagues in reversing the trial court's determination that the defendant home inspector is exempt from liability under the Consumer Fraud Act ("CFA").

In doing so, I recognize that thirteen years ago I served on the appellate panel in Plemmons v. Blue Chip Insurance Services, Inc., 387 N.J. Super. 551 (App. Div. 2006), which held that an insurance broker is a regulated "semi-professional" who is excluded from liability under the CFA.

Unlike in Plemmons, in the present case our court has the benefit of the advocacy of the Attorney General, who persuasively argues as amicus curiae why the semi-professional distinction is problematic and appears to clash with legislative intent and the limited Supreme Court precedent that exists on the subject. The Attorney General also raises substantial policy considerations from his unique perspective as both an enforcer of the CFA and as overseer of the Division that regulates home inspectors.

With all due respect, I've changed my mind.[1]

_____

[1] See, e.g., Olds v. Donnelly, 150 N.J. 424, 440-42 (1997) (in which Justice Pollock explained why the Court was departing from an approach of one of its

(continued)

Even if, hypothetically, the "semi-professional" distinction were doctrinally preserved (which we are not advocating), the licensure requirements for insurance brokers – and their associated fiduciary duties – appear to me to be more stringent than those governing home inspectors. Comparatively, the grounds for a blanket occupational exemption from the CFA's anti-fraud provisions are weaker. I say that without intending to diminish the importance of the work done by qualified professional home inspectors, who certainly provide a valuable service to home buyers and sellers.

Of course, as the majority opinion points out, if there is a direct clash between the CFA and the regulatory scheme, limitations of preemption can pertain. But no such clash has been identified here.

That said, this case may well present a suitable opportunity for the Court to provide helpful updated guidance on the contours of the learned professional doctrine. In any event, nothing in this opinion prevents the Legislature from adopting amendments that clarify the statutory scheme.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

(continued)
previous decisions "[o]n further consideration," because experience had shown the approach had not fulfilled expectations).

A-5686-17T1